UNITED STATES of America,

v.

**Marcos MONTILLA and Nitza Colon, Defendants.**

**No. CR–89–142C.**

United States District Court, W.D. New York.

March 22, 1990.

---

**580**

Dennis C. Vacco, U.S. Atty. (Thomas S. Duszkiewicz, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for U.S.

Cohen & Lombardo, P.C. (Robert N. Convissar, of counsel), Buffalo, N.Y., for defendant Montilla.

J. Glenn Davis, Buffalo, N.Y., for defendant Colon.

## INTRODUCTION

CURTIN, District Judge.

Defendants Marcos Montilla and Nitza Colon are charged with possession with intent to distribute a Schedule II controlled substance and conspiracy and agreement to possess with intent to distribute a Schedule II controlled substance, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and 21 U.S.C. § 846.

At the hearing on October 30, 1989, testimony was heard from Drug Enforcement Administration [DEA] Agent Bruce Johnson; Paul Terranova, an Erie County Deputy Sheriff assigned to the DEA; and Border Patrol Agent John Crocitto. The defendants did not testify.

## FACTS

On August 3, 1989, agents of the United States Drug Enforcement Agency Task Force ("DEA") were assigned to observe passengers disembark from the New York City express bus at the Niagara Frontier Transportation Authority Bus Terminal ("NFTA Terminal") (T. 8–9). Because this express bus was considered to be a major source for the flow of narcotics into this area, the agents watched it regularly. They testified that on the average, they stopped about 80 disembarking passengers a month meeting a "drug profile," and three to four arrests resulted (T. 37).

On August 3, 1989, at approximately 7:30 a.m., the agents saw two individuals, later identified as the defendants, leave the bus, enter the terminal, and walk toward the North Division Street exit. DEA Agent Bruce Johnson testified:

A Number, 1 they were very nervous when they entered the terminal, they were constantly looking around, and I'm not saying in a general look around manner. It was very quick glances back and forth. They were talking very, very quietly with each other. As they walked through the terminal they kept looking back over their shoulder and again scanning the terminal. At one particular point as they approached Investigator Terranova's position, which was about midway in the terminal, they walked towards him, they looked right at him and immediately did a turn and walked very, very briskly away, again constantly looking over their shoulder as they walked away from him.

Q When you made these observations as you have just testified to about their nervous character and change of direction, et cetera, were either of the individuals carrying anything with them?

A Yes, sir. They were both carrying what I call either overnight bags or duffel bags. As I recall, the male was carrying a red duffel bag and the female was carrying a blue duffel bag.

(T. 12–13)

At that time, the agents had no prior information about the defendants (T. 42).

All the agents were in plain clothes, and as Agent Terranova explained, they were trying to be undercover and inconspicuous, not looking like police officers (T. 49). He said that when the defendants got off the bus, he was stationed about midway in the station with his back to the wall. When they approached him, it was necessary for them to turn one way or the other. They turned left to proceed to the North Division exit (T. 49).

A signal to stop the defendants was given by eye contact. This decision was based upon defendants' nervous reactions, the use of the express bus from New York City, and their pace through the terminal. The agents testified that they did not base their decision upon the fact that the defendants appeared to be Puerto Rican (T. 52, 54, 101).

The defendants were stopped initially by Agent Bruce Johnson, who spoke to them in English. Johnson said that Montilla spoke in somewhat broken English, but it was understandable, and Ms. Colon spoke very good English. None of the agents at the scene spoke Spanish. Johnson said that both defendants told him that they understood English, and they responded to him in English. The defendants consistently spoke between themselves in Spanish (T. 55–58).

When Agent Johnson asked for identification, defendant Colon produced an Erie County Social Services card, said that she lived on Mariner Street in Buffalo and had been in New York for two weeks. Referring to her blue duffel bag one of the agents said to her, "That doesn't seem to be much luggage for a two-week stay". In response, she merely shrugged her shoulders.

Johnson claims that defendant Montilla said that he had no identification and that he was from New York (T. 20, 68). There appears to be confusion as to the response made by defendant Montilla. It is not clear that Terranova heard defendant Montilla speak in English. As he approached the area where Johnson was asking the defendants for identification, Terranova said that when the question was put to Montilla, he

simply "shook his head no." (T. 96.) With that, Terranova noticed the wallet in his pocket. When he pointed to it, Montilla took it out (T. 96). At the suppression hearing, he testified that he "asked [Montilla] if he was sure he didn't have any identification. He said yes I do, and he pulled out his wallet." (T. 97.) At the preliminary hearing, however, Agent Terranova stated that Montilla handed over the wallet without speaking (T. 98). Johnson observed Terranova look at the wallet, but before anything further occurred, he told the defendants they were members of the Drug Enforcement Task Force and were looking for narcotics, and he asked, "would you mind if we took a quick look through your bags." He said that he also said to them, "you're not under arrest, you don't have to if you don't want to." (T. 20–23.)

Terranova testified that as he approached Johnson and the defendant, Johnson was asking for identification. He said that when he saw the bulge in Montilla's pocket "I pointed to the wallet and asked him again if he was sure he did not have any identification". According to Terranova, Montilla responded "Yes I do" and he reached for his wallet. Terranova said he was addressed and responded to in English. Inspection of the wallet by Terranova revealed identification also in the name of Robert Rutkowski. When Terranova asked him about the Rutkowski card he did not respond (T. 79–81). As I read the record, it appears that none of this information was made available to Johnson when he asked the defendant if he could take a quick look at their bags.

According to Johnson when the request to open the bags was made, Montilla, without speaking but nodding his head, unzipped both bags. Nothing other than clothes and personal items were found in Montilla's bag (T. 25). However, defendant Colon's blue bag yielded a shape wrapped in male clothing. Upon opening the clothing, a plastic bag which contained a taped package was found (T. 25). Johnson testified that when he picked the package out of the bag, Montilla said something to the

effect, "she doesn't know anything about it, it's not hers." (T. 26.) Again, there is confusion in the testimony. When Terranova appeared before the grand jury he said that the bags were opened by Agent Johnson. Upon further questioning by the Assistant U.S. Attorney, he then said that Montilla unzipped the bags (T. 99, 100).

After the taped package was found both defendants were taken to a small room inside the terminal which served as the NFTA's Security Office. Although not informed that they were under arrest, it was clear that they were not free to leave (T. 29, 62). Upon further examination, it was discovered that the plastic bag contained cocaine (T. 30–31).

While the substance was being tested, Spanish-speaking Border Patrol Agent John Crocitto arrived (T. 32, 85, 116). He was called because it was suspected that the defendants might be illegal aliens. From this point, there are further contradictions in the testimony. Agents Johnson and Terranova claim that when Montilla was questioned about the cocaine, he said that it was his in English (T. 64, 85, 102). On the other hand, Agent Crocitto, who was present during the testing, denies hearing any conversation by defendant Montilla in English (T. 116–18). He said that the room was small, everyone was fairly close together, and he would have been in a position to hear any conversation between the DEA agents and defendant Montilla (T. 118). Crocitto said that defendant Montilla had little knowledge of the English language and did not understand him when he gave the *Miranda* warnings to him in English (T. 119–20). In his opinion, Montilla neither understands nor speaks English.

In any event, even assuming that the version given by Agent Johnson is correct, any alleged admissions by defendant Montilla occurring after the defendants were taken to the NFTA office, when they were not free to leave and before any *Miranda* warnings were given in either English or Spanish (T. 64–65) must be suppressed.

After Crocitto gave the defendants their *Miranda* warnings in English and Spanish,

Montilla said that the problem was his and that she (Colon) had nothing to do with it. He said that he had brought the package up from Manhattan. Ms. Colon told Crocitto that she had flown down the day prior to the arrest and had an airplane boarding stub to verify her air passage. When asked how the package got in Ms. Colon's bag, Montilla said that he had simply put it there.

## DISCUSSION

■ The government argues that the initial questioning of defendants was proper under the circumstances, *citing United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); and *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The government argues that there was adequate justification for the stop; noting that the defendants alighted from the New York City express bus with duffel bags, hurried through the bus station while carrying on an animated conversation and abruptly turned away from Agent Terranova as they proceeded to the North Division Street exit.

The court is aware that all of the circumstances should be taken into account in making a determination as to whether the stop is justified. *United States v. Cortez, supra.* But to determine whether all of the circumstances justify the stop, the worth of each factor should be considered. It may be that some individuals who use the New York City express bus are drug couriers but certainly most are not. Three arrests out of eighty confrontations is not a persuasive record. Furthermore, bus passengers on overnight trips often carry canvas duffel-type bags similar to the defendants' and do not carry large amounts of luggage. Many travelers speak in a confidential tone to their traveling compan-

ions and are anxious to be on their journey after a long bus ride. Further, the government makes too much of the manner in which the defendants approached Terranova and turned abruptly away. Terranova was not in uniform and his back was to a wall. As the defendants approached his place in the terminal, they and other passengers had to walk between rows of chairs. When they arrived in the area where he was standing, it was necessary for them to turn left if they wanted to proceed to the North Division Street exit. Many other passengers followed the same path and made the same turn in order to exit the building.

In every case relied upon by the government, there is a greater factual basis for the initial stop. In *Terry, supra,* Detective McFadden observed two individuals walking back and forth staring into a store window about 24 times, and stopping for a conference at a nearby corner with a third man. Eventually, the Detective McFadden stopped them and an arrest followed. In *Sokolow, supra,* the court continued the rationale of *Terry* putting down the rule that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." *Sokolow,* —— U.S. at ——, 109 S.Ct. at 1585. In this case, there is the additional difficulty that it is highly questionable whether Montilla clearly understood what the agents were talking about. It was Agent Crocitto's opinion that he did not understand English at all. Perhaps Montilla is a good actor and his understanding is more than he makes out. But there was clearly no attempt made by the officers at the initial meeting to determine whether he understood them or not. They simply proceeded, assuming that he did after a very brief conversation. Rather than make assumptions as to this important consideration of whether the defendant understood, it would be much better for the agents to take some time at the outset to be certain that the individual stopped understood what is being said to him.

In *Florida v. Royer, supra,* a stop was approved when the agents knew that the defendant had purchased a one-way airline ticket at Miami to New York City under an assumed name and checked his suitcases bearing identification tags with the same assumed name.

In *Sokolow, supra,* when the agents stopped the defendant, they knew that he had paid $2,100.00 for two round-trip plane tickets from a roll of twenty-dollar bills, that he had traveled under a name that did not match the name under which his telephone number was listed, and that his original destination was Miami, a source city for illicit drugs. He was in Miami for only 48 hours even though a round-trip flight from Honolulu to Miami takes 20 hours. He appeared nervous during his trip, and he checked none of his luggage. The Supreme Court found that there was reasonable suspicion that respondent was transporting illegal drugs when he was stopped. The court relied upon *Terry* but pointed out that reasonable suspicion means something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.

In *United States v. Mendenhall, supra,* the defendant was stopped at the Detroit airport after arriving on a flight from Los Angeles, a source city for drugs. She was the last person to leave the plane, appeared to be very nervous and completely scanned the whole area where the agents were standing. She proceeded past the baggage area without claiming any luggage, and then changed airlines for a flight out of Detroit. When the agents approached her and asked for identification she produced airline tickets in the name of Ford and an operator's license in the name of Mendenhall. She said that she had been in California for two days. When she learned that her questioners were narcotics agents she became quite shaken, extremely nervous and had a hard time speaking. The court held the stop justified under *Terry.*

In every one of these cases the agents were aware of a number of additional reasons to persuade them that the defendant's

acts were suspicious. The Supreme Court case most similar to ours is *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In that case, when the petitioner arrived at the Atlanta airport, he kept looking backward at a second man. He had a shoulder bag but no other luggage. When the two men left the terminal, the agent asked them for identification. After they consented to a search, the petitioner tried to run away. In doing this, he abandoned his bag, which was later found to contain cocaine.

The Supreme Court held that the agent could not have reasonably suspected petitioner of criminal activity on these facts. The fact that the petitioner preceded another person and occasionally looked backward as he walked through the concourse was not sufficient. His actions were similar to those of many innocent travelers. The fact that the agent believed that they were attempting to conceal the fact that they were traveling together was insufficient. The Court said: "While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Id.* at 440, 100 S.Ct. at 2754.

■ Under all of the circumstances presented in this case, I find that the officers were not justified in stopping the individual defendants, seeking identification and asking to examine their baggage. The information available was not sufficient to consider that the defendants met a drug courier profile. Assuming, however, there was justification for the initial stop and that the agents were entitled to ask the defendants some questions, the problem of whether they had the right to request an examination of the baggage and whether the defendants freely consented, must be discussed. Separate consideration should be given to the merits of stopping each defendant. *United States v. Moreno, Libreros,* 897 F.2d 26 (2nd Cir.1990). Ms. Colon presented identification giving a local

Buffalo address, was not nervous, and the agents had no other information to question her behavior. The fact that she shrugged her shoulders when asked about sparsity of the luggage is a slender reed to warrant a request to open her bags. Although Johnson said she answered "Yes" when he made the request to examine the bag in and of itself is not sufficient to meet the standard of knowledgeable assent required for a search. Considering all the circumstances I do not find that her consent was knowledgeable and freely given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The request was made in a studied, offhand manner designed to convince the defendants that the look in the bag was routine and would not lead to serious consequences. Johnson did not use the word "search" since the use of that word may have put the defendants on guard and made it possible that they might say "no". (T. 59). The agents held the defendants' identification when the request to search was made. (T. 80) Furthermore, she did not open the bag. It was opened either by Agent Johnson or Mr. Montilla.

In the case of defendant Montilla, assuming for the moment that he spoke and understood English, again the offhand manner in which Johnson put the question makes questionable whether appropriate consent was given. Further, I find no reason to support a finding that defendant Montilla had the right to open the Colon bag. Assuming that he assented to open his bag, there was nothing found and therefore nothing to suppress.

There remains open the question as to whether the statements made by Mr. Montilla to Crocitto after he was advised of his rights in Spanish should be admitted. That question was not addressed during argument or briefing. The government and Montilla's attorney shall supply a memorandum on this question not later than April 4, 1990. The motion to suppress the search of the Colon bag is granted. It does not appear that Ms. Colon made any statements to the officers and if she or Montilla did before the meeting with Crocitto that was before any *Miranda* rights were giv-

en. Any statements made to Officer Johnson or Terranova after the bags were opened, but before the *Miranda* warnings, must be suppressed because neither defendant was free to leave at that time. The court will meet with counsel on March 27, 1990 at 11:00 A.M. to set a further schedule.

So Ordered.