OPINION OF THE COURT
Mario J. Rossetti, J.
This indictment charges defendant, Derrick Branch, with criminal possession of a controlled substance in the first degree; and defendant, David Johnson, with criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree. Defen *499 dants have separately moved for suppression of contraband and statements taken from them at the time of their arrest.
A hearing was held on June 21, 1990, at which Drug Enforcement Agent Bruce R. Johnson and United States Border Patrol Agent David F. Allman testified. Following the hearing, memoranda of law were submitted by defendant Branch on July 13, 1990, by defendant Johnson on July 16, 1990, and by the People on July 23, 1990.
FINDINGS OF FACT
Agents Johnson and Allman both testified that on December 5, 1989, they were stationed at the Niagara Frontier Bus Terminal, in plain clothes, as part of a drug interdiction operation carried out by the United States Government Drug Enforcement Administration. The agents’ specific assignment involved surveillance of passengers exiting the New York City to Buffalo express bus, which, according to Agent Johnson, is allegedly used as a means of transporting drugs. The agents were looking for passengers whose behavior suggested that they might be drug carriers.
It would appear, therefore, that all passengers on those specific buses are potential drug carriers, and those passengers whose behavior is seemingly out of the ordinary might be subject to police interference.
At 7:30 A.M., an express bus arrived from New York City and a number of passengers exited therefrom, including defendants Branch and Johnson.
Agent Johnson testified that defendants remained outside the terminal for a few minutes engaged in conversation, and he observed that they did not claim any luggage. According to Agent Johnson, the defendants appeared nervous.
After entering the terminal, defendants separated and walked on opposite sides of the concourse. The agents testified that both defendants continuously scanned the area, looked over their shoulders, and acted in a generally nervous manner.
Agent Johnson further testified that defendant Johnson walked by the agents, who were standing next to a uniformed Border Patrol Agent, Pat Norton, looked directly at them and walked rapidly away, continually looking back at the agents. The defendants then rejoined each other at the exit vestibule, and, according to Agent Johnson, defendant Johnson while speaking with Branch, nodded his head back toward the *500 agents. Agent Johnson then approached defendant Branch, while Allman and Norton approached defendant Johnson.
Agent Johnson testified that he identified himself as a police officer and asked Branch if he could talk with him for a minute, to which Branch said that it would be no problem. According to Johnson, Branch appeared very nervous, fidgety, and sweaty. When asked where he lived, Branch replied "Buffalo”, then changed to "New York City”, then changed back to "Buffalo”. When asked where he lived in Buffalo, Branch replied that he did not yet have a place to stay. In response to further questioning, Branch stated that he worked at McDonalds, but could not give the location, nor did he have any identification.
Agent Johnson further testified that he noticed fresh needle marks on Branch’s left wrist, and then asked Branch if he would accompany him to the Niagara Frontier Police office, which was located in the terminal, 10 to 15 yards from the vestibule. Branch complied with the request.
Meanwhile, Agent Allman, accompanied by Agent Norton, approached defendant Johnson, identified himself as a Border Patrol Agent, displayed his badge, and asked if he could ask a few questions. Johnson agreed, and in response to Allman’s questioning, stated that he was a United States citizen, and that he and his parents were born in New York City, but that he did not have any identification. Allman noticed a bulge in defendant Johnson’s back pocket and asked if it was a wallet which might contain identification. Johnson produced a wallet from which he took a "certified identification card”.
Allman further testified that Johnson spoke with what he perceived to be a Jamaican accent, that the certified identification card was commonly used by illegal aliens, and that he, therefore, suspected Johnson to be such an illegal alien. He also testified that defendant Johnson did not appear to be nervous, and, although somewhat perturbed by the questioning, was otherwise calm.
Based upon this encounter, Allman asked, and Johnson agreed to answer further questions at the Niagara Frontier Police office.
Defendants Johnson and Branch were both questioned in the same room, approximately eight feet from each other by Agents Johnson and Allman, with Agent Norton also present.
According to Agent Johnson, defendant Branch, during the questioning, appeared very nervous. He further testified that *501 he noticed a bulge in the groin area of Branch’s pants, and asked Branch what it was. In response, Branch became hysterical, started yelling and screaming, and waiving his arms. Agents Johnson and Norton attempted to calm him down, grabbed his arms and pinned him against a wall.
Allman, meanwhile, was questioning defendant Johnson, who gave Allman the name and telephone number of a person who could confirm his identification. Allman telephoned and spoke with the named person, but she could not, or would not confirm Johnson’s identification. Shortly thereafter, as Branch started yelling, Allman observed defendant Johnson lowering his hands toward his waist; Allman immediately yelled for defendant Johnson to stop and to put his hands up, and Johnson complied.
Allman frisked defendant Johnson, felt a hard metallic object in Johnson’s pants, pulled out same, revealing a handgun. Allman then arrested defendant Johnson and searched his belongings, including his overnight bag, in which he found a clip containing four rounds of ammunition.
Agent Johnson testified that, while Allman was arresting defendant Johnson, Branch reached into his pants, and produced a plastic bag containing a white powder, which he then handed to Agent Johnson. The powder field tested positive for cocaine, and Branch was arrested for possession of same.
After the arrests, Agent Allman simultaneously advised the defendants of their Miranda rights, and each acknowledged that they understood same. Both defendants were then transported to the Erie County Central Police Services to have their arrests processed.
Agent Johnson testified that, while defendant Johnson was being booked, Branch, in response to his questioning, stated that he got the drugs from some girl in New York City, brought it from there, that it was cocaine, and not crack, and that it was about two ounces.
CONCLUSIONS OF LAW
The officers clearly lacked any concrete indication of criminality prior to approaching the defendants. A police officer may, however, approach a private citizen on the street for the purpose of requesting information, even without any indication of criminal activity if the officer can articulate reasons sufficient to justify his action (People v De Bour, 40 NY2d 210). Whether or not such police action is lawful requires an *502 analysis of the manner and intensity of the interference, the gravity of the crime involved, and the circumstances attending the encounter (People v De Bour, supra, at 219).
In De Bour (supra), the Court of Appeals held that the police action in stopping and questioning an individual on the street without any indication of criminality was, under the circumstances of that case, legal.
In De Bour (supra), the stop was brief, devoid of harassment, and the questions circumscribed in scope to the officer’s task as a foot patrolman. The crime sought to be prevented involved narcotics, a serious crime. The court further found the attendant circumstances sufficient to arouse the officers’ interest in that the encounter occurred after midnight in an area known for its high incidence of drug activity, and only after De Bour had conspicuously crossed the street to avoid walking past the uniformed officers (People v De Bour, supra, at 220).
The case herein is similar to the facts in Be Bour (supra) only in that it involved a concern for narcotics. Unlike Be Bour, however, the stop was not brief, nor devoid of harassment or intimidation in that it involved removal of defendants from the relatively neutral atmosphere of the bus terminal concourse to the obviously intimidating atmosphere of the Niagara Frontier Police office (see, Florida v Royer, 460 US 491). The questioning was more extensive and involved more than a mere request for identification, in that the agents questioned defendants concerning their residence, their employment, and their citizenship.
The most significant aspect distinguishing this case from Be Bour (supra) is the attendant circumstances. The stop herein was made during the day, at a bus terminal where many people were coming and going. Unlike De Bour, who conspicuously avoided the uniformed officers, defendant Johnson walked directly by uniformed Agent Norton. The defendants’ alleged behavior, i.e., the nervousness, looking around, speaking briefly before entering the terminal, etc., is not unusual behavior at an airport or bus terminal, and cannot form the basis for the police interference. (See, United States v Montilla, 733 F Supp 579 [WD NY, Mar. 22,1990, Curtin, J.].)
Although this court recognizes the seriousness of our society’s drug problem, the police action herein simply is not reasonable under the aforementioned findings of fact. If this police action was permitted, every passenger on a targeted bus would be a potential drug suspect and could be subject to *503 police interference if they allegedly appeared "nervous”. Such an infringement on our citizens’ right to travel freely and securely without being subject to such police interference is unacceptable without more reliable objective criteria than demonstrated herein.
Pursuant to the foregoing, the police action herein was not reasonable under the standards articulated in People v De Bour (supra), and, therefore, unlawful.
Furthermore, even if it can be deemed that the officers’ initial stop and request for information was permissible under the first level of intrusion authorized in De Bour (supra), the agents’ request for defendants to accompany them into the Niagara Frontier Transit Authority (NFTA) Police office for the purposes of more extensive questioning was clearly unlawful. Isolating defendants at the NFTA Police office, although arguably less than a forcible seizure, manifestly entailed a greater intrusion, necessitating a founded suspicion that defendants were involved in criminal activity (People v De Bour, supra, at 223; see also, Florida v Royer, supra).
As previously stated, defendants’ behavior, as testified to by the agents, was equivocal at best, and did not support a founded suspicion that defendants were involved in criminal activity. The agents had no information that a crime had occurred, or was about to take place, had not seen defendants do anything criminal, and the facts known to the agents were susceptible of innocent interpretation (see, Florida v Royer, supra; People v Howard, 50 NY2d 583, 590, 591; People v Cantor, 36 NY2d 106; People v Terracciano, 135 AD2d 849; People v Taveras, 155 AD2d 131).
In conclusion, the stop and questioning of defendants was illegal, and the subsequently obtained contraband and statements constitute the fruits of such illegal police conduct and must be, and are hereby, suppressed (Wong Sun v United States, 371 US 471; People v Cantor, supra).