**UNITED STATES of America,
Appellant,**

v.

**Marcos MONTILLA and Nitza Colon,
Defendants–Appellees.**

No. 726, Docket 90–1446.

United States Court of Appeals,
Second Circuit.

Argued Jan. 9, 1991.

Decided March 21, 1991.

Kathleen A. Felton, Dept. of Justice, Washington, D.C. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., Buffalo, N.Y., Thomas S. Duszkiewicz, Asst. U.S. Atty., of counsel), for appellant.

Robert N. Convissar, Buffalo, N.Y. (Cohen & Lombardo, P.C., Buffalo, N.Y. of counsel), for defendant-appellee Marcos Montilla.

J. Glenn Davis, Buffalo, N.Y., for defendant-appellee Nitza Colon.

Before WINTER, ALTIMARI and McLAUGHLIN, Circuit Judges.

WINTER, Circuit Judge:

This is an appeal from Judge Curtin's decision granting a motion to suppress drugs found in Nitza Colon's bag. We hold that Colon consented to the search of her bag. We remand the issue of whether appellees were illegally seized before that consent was given.

## BACKGROUND

Agents of the Drug Enforcement Administration ("DEA") Task Force regularly observe passengers departing the express bus from New York City at the Niagara Frontier Transportation Authority bus terminal ("the terminal") in Buffalo, New York. New York City is the principal source for drugs sold in western New York, and DEA agents believe that the express bus is often used by drug traffickers. Employing a "drug courier profile," each month the agents question about

eighty disembarking passengers and make three to four arrests.

On August 3, 1989, DEA agents saw Marcos Montilla and Nitza Colon leave the express bus gate and enter the terminal. Montilla was carrying a red duffel bag; Colon was carrying a blue duffel bag. Agent Bruce Johnson testified that Montilla and Colon appeared to be nervous when they entered the terminal, that they looked around furtively, and that they were talking "very, very quietly with each other." As they walked through the terminal, Johnson observed them looking over their shoulders and scanning the terminal. When Montilla and Colon reached Agent Paul Terranova, who was standing against a wall of the terminal, they made a sharp turn and walked rapidly toward an exit, once again looking over their shoulders.

Terranova and Johnson signaled to each other their suspicion of Montilla and Colon. Johnson approached appellees in an area between the inner doors of the terminal and the outer revolving doors that lead to the street. Johnson testified that he identified himself as a law enforcement officer, displayed his badge, and "asked if [he] could speak to them." According to Johnson, Montilla and Colon both answered "yes" to this question. He then asked them whether they understood English, and they again responded "yes."

Johnson asked appellees for identification. Colon produced a social services card and stated that she lived on Mariner Street in Buffalo. Montilla said that he had no identification and that he was from New York City. As Terranova approached, he noticed a bulge in Montilla's rear pocket, pointed to it and asked Montilla whether he was sure that he did not have any identification. Terranova testified at a suppression hearing that Montilla pulled out a wallet and stated "yes I do." The wallet contained three identification cards. One bore the name "Robert Rutkowski" while the other two were in Montilla's name. Terranova questioned Montilla about the Rutkowski identification, but Montilla remained silent.

While Terranova was questioning Montilla, Johnson asked Colon what she had done in New York City, and how long she had been there. Colon answered that she had been in New York City for two weeks. One of the agents commented that she did not appear to have much luggage for a two-week stay. Colon shrugged her shoulders and did not answer. At this point, Johnson testified:

I explained that we were members of the Drug Enforcement Task Force and we were looking for narcotics, and I said, would you mind if we took a quick look through your bags.... I said, you're not under arrest, you don't have to if you don't want to. At that point [Colon] said, yes, and [Montilla] nodded his head yes and unzipped both bags.

Terranova gave similar testimony concerning the request to look through the bags.

Montilla's bag contained only clothing and personal items. A search of Colon's bag, however, revealed a hard shape wrapped in an article of clothing. Inside the clothing was a plastic bag containing a taped package. Terranova testified that "the manner in which it was packaged and hidden is very consistent with subjects that travel with narcotics." The agents then asked appellees to accompany them to the terminal security office. In the taped package was white powder that was ultimately found to be cocaine. Montilla and Colon were placed under arrest.

While the white powder was being tested, Johnson summoned a Spanish-speaking Border Patrol agent, John Crocitto, based on the suspicion that appellees were illegal aliens. Crocitto gave both appellees *Miranda* warnings. He testified that he spoke with Colon mostly in English and read the *Miranda* warnings to her in English. She indicated that she understood. Crocitto said that Montilla had little knowledge of English and that he read the *Miranda* warnings to Montilla in Spanish. After the warnings, Montilla told Crocitto "that the problem was his and had nothing to do with [Colon], and that he was ready to face whatever was coming in his direction." Montilla admitted that he had

brought the cocaine from New York City. When asked how the package had gotten into Colon's bag, Montilla said that he had put it there. Crocitto did not hear Montilla speak English at any time.

Montilla and Colon were indicted for possessing with intent to distribute cocaine and for conspiracy to commit the substantive offense in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988) and 18 U.S.C. § 2 (1988). Appellees moved to suppress the physical evidence of the cocaine found in Colon's bag. At the suppression hearing the government argued that the initial questioning of Montilla and Colon was justified by a reasonable suspicion that they were transporting drugs. The government also contended that Colon consented to the search of her bag.

The district court ruled that "the officers were not justified in stopping the individual defendants, seeking identification and asking to examine their baggage," *United States v. Montilla*, 733 F.Supp. 579, 584 (W.D.N.Y.1990). Observing that many travelers carry duffel bags, do not carry large amounts of luggage, speak in a confidential tone to their traveling companions, and "are anxious to be on their journey after a long bus ride," Judge Curtin held that the information initially available to the agents was insufficient to match a legitimate drug courier profile. *See id.* at 582–83, 584. The government does not challenge this ruling on appeal. The district court also ruled that, even if the decision to stop appellees was justified, neither appellee had given knowing and voluntary consent to the search of the bags. *See id.* at 584.

In a motion for reconsideration, the government argued, *inter alia*, that the initial questioning of Montilla and Colon was a consensual encounter rather than a seizure for Fourth Amendment purposes, that Colon and Montilla consented to the search of their bags, and that, in any event, Montilla had no standing to challenge an illegal search of Colon's bag. The district court denied the motion, stating that the

District of Columbia Circuit cases on which the government's new argument was based were "wrongly decided" in light of *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). *See United States v. Montilla*, 739 F.Supp. 143, 144 (W.D.N.Y.1990). Addressing the facts of the encounter with Montilla and Colon, the court concluded that

> considering all of the circumstances in this case, it would be reasonable for the defendants to assume that they were not free to leave. The agents had Montilla's identification, they had identified themselves as federal agents, they never told the defendants that they were free to leave, and they had the bags under control.

*Id.* Finally, the court declined to address the government's standing argument, observing that "[t]his argument was not raised during the time of the original hearing, and the court sees no need to consider it at the present time." *Id.* at 145.

The government now appeals the district court's suppression order pursuant to 18 U.S.C. § 3731 (1988).

## DISCUSSION

On this appeal, the government has abandoned its earlier position that the agents had a reasonable suspicion to detain defendants for questioning under the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We thus first consider whether Colon consented to the search of her bag. Because we conclude that she did,[1] we then address whether that consent was invalid because it was given in the course of an illegal seizure.

### A. *Colon's Consent to the Search*

■ The district court found that Colon did not voluntarily consent to the search of her bag. *See* 733 F.Supp. at 584; 739 F.Supp. at 145. We disagree. The district court's credibility findings, which are binding upon us, accepted the DEA agents' version of events concerning the search of

---

1. Because we find that Colon consented to the search, we do not address the government's argument that Montilla lacked standing to challenge the search of Colon's bag.

Colon's bag. The agents testified that they told Montilla and Colon that they were narcotics officers who were looking for drugs. Johnson then asked them: "[W]ould you mind if we took a quick look through your bags.... [Y]ou're not under arrest, you don't have to if you don't want to." Colon answered "yes" to this question and Montilla nodded his head. *See* 739 F.Supp. at 144–45; 733 F.Supp. at 581. The record is unclear as to whether Johnson or Montilla unzipped the bags. However, Colon in no way objected.

In its initial opinion, the court stressed the "studied, offhand manner" in which the request was made and in particular the fact that the agents avoided using the word "search." The court also noted that the agents held appellees' identification, and that Colon did not open her own bag for the search. *See* 733 F.Supp. at 584. On reconsideration, the court reaffirmed its conclusion that Colon's affirmative response to the request to search was insufficient to indicate consent. The court speculated that the word "yes" may have been used as an acknowledgement of a series of statements rather than consent to the request to search or may have had a different meaning to someone such as Colon who was "primarily a Spanish-speaking individual." *See* 739 F.Supp. at 145.

The district court's conclusions are not supported by the testimony it accepted as true. Whether avoiding the word "search" or requesting a "quick look" might be viewed as "offhand" is beside the point in view of the fact that the agents unambiguously informed appellees that they were looking for narcotics and that they wished to look through the bags. There is no reason to believe that Colon, who did not testify at the suppression hearing, viewed that request as "routine," "offhand," or not likely to lead to serious consequences if narcotics were discovered. Moreover, the district court stated in its second opinion that the agents held only Montilla's identification when the request to search was made. *See* 739 F.Supp. at 144.

Finally, Colon's words and actions indicated that she consented to the search.

There is no evidence that Colon had any trouble understanding the agents' request to look in her bag. She spoke primarily in English at all relevant times, and no one testified that she had any difficulty understanding questions or framing answers. There is, therefore, no reason to discount Colon's direct and unambiguous answer to the request to search her bag.

B. *The Initial Encounter and Questioning*

We now consider whether Colon's consent was vitiated because she and Montilla were illegally seized when the agents initially approached and questioned them. We reiterate that if a seizure occurred, it was illegal, because the government makes no claim that the agents had probable cause for an arrest or that the encounter was a stop valid under *Terry v. Ohio.*

As the Supreme Court has repeatedly observed:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16). A person has been seized for purposes of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.); *see also Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979 (unanimous Court applying *Mendenhall* standard); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion of White, J.); *United States v. Moreno,* 897 F.2d 26, 30 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990). The Court has

noted that this standard is "necessarily imprecise" and that "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573–74, 108 S.Ct. at 1979–80. Examples of circumstances that may lead a reasonable person to conclude that he or she is not free to leave include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *see also United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir.1984).

■■■ We review the district court's factual findings under the familiar "clearly erroneous" standard. *See United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984). However, there exists some uncertainty concerning the appropriate standard of review for the ultimate determination of whether a reasonable person would have felt free to leave. *See United States v. Ceballos*, 812 F.2d 42, 47 n. 1 (2d Cir.1987). Although the Supreme Court has not spoken unequivocally on this subject, we believe that findings as to what the various parties to such an encounter said or did are subject to the clearly erroneous standard. However, whether those statements and acts resulted in a seizure is a question of law subject to *de novo* review. *Cf. United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990) (reviewing *de novo* whether probable cause to arrest existed on the basis of the district court's factual findings).

The "reasonable person" test is an objective standard that "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment" and "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1980. Such an objective inquiry pointedly eschews consideration of intent and involves an essentially legal assessment of whether the particular circumstances would warrant the belief that a person has been detained. Moreover, the Supreme Court's own practice suggests strongly that it views the seizure issue as a legal question. In *Florida v. Royer*, Justice White's plurality opinion applied the *Mendenhall* test without relying on, or deferring to, the trial court's seizure ruling. *See* 460 U.S. at 501–02, 103 S.Ct. at 1326–27. Similarly, in *Chesternut* a unanimous Court reversed the magistrate's determination that the defendant had been seized, again without deference to the trier of fact. *See* 486 U.S. at 574, 108 S.Ct. at 1980 ("Applying the Court's test to the facts of this case, we conclude that respondent was not seized by the police...."). We thus hold that the seizure issue is a question of law subject to *de novo* review.[2]

On the government's motion for reconsideration, the district court ruled that Montilla and Colon were illegally seized when the agents approached and questioned them. *See* 739 F.Supp. at 144. Although the district court based its ruling on "all of the circumstances in this case," it enumerated four facts as decisive: (i) the agents had Montilla's identification; (ii) they had identified themselves as federal agents; (iii) they never told appellees that

---

**2.** There is a conflict among the circuits concerning the appropriate standard of review regarding the seizure issue. The D.C. Circuit recently has adopted a *de novo* standard of review for Fourth Amendment seizure issues. *See United States v. Maragh*, 894 F.2d 415, 417–18 (D.C. Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990). However, other circuits that have directly considered the issue appear to have adopted a "clearly erroneous" standard of review. *See, e.g., United States v. Rose*, 889 F.2d 1490, 1495 (6th Cir.1989); *United*

*States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989). *But see United States v. Mines*, 883 F.2d 801, 803 (9th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 552, 107 L.Ed.2d 549 (1990) ("findings of fact" are reviewed for clear error while "'[t]he ultimate conclusion of the lawfulness of a seizure ... is reviewed de novo'") (quoting *United States v. Mitchell*, 812 F.2d 1250, 1253 (9th Cir.1987)); *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988) (same).

they were free to leave; and (iv) the agents had appellees' bags under their control. *See id.*

▮ Before assessing the legal significance of these findings, we consider whether they are supported by the record. The first three findings are undisputed. However, the district court's finding that the bags were under the agents' control is clearly erroneous. There is no evidence of any action by the agents that could reasonably be deemed an assertion of control over the bags until they conducted the search. *See* 733 F.Supp. at 581. Accordingly, we conclude that the agents did not have control over the bags until the search.

▮ The remaining findings are insufficient to support the legal conclusion that Montilla and Colon were seized. Johnson testified that he approached Montilla and Colon and asked whether he might speak with them, to which Colon answered "yes" and Montilla nodded. *See* 739 F.Supp. at 144–45; 733 F.Supp. at 581. The agents did not have Montilla's identification when they initiated the encounter and retained it only when they discovered that he was carrying identification in two different names. In any event, the district court expressly found that the request to search the defendants' bags was more or less simultaneous with the examination of their identification. *See* 733 F.Supp. at 581. Whatever minimal coercive effect the discussion of the identification may have had, it was not a sufficient show of force or authority to undermine the consensual nature of the encounter as recounted by Johnson. Similarly, it was entirely appropriate for the agents to identify themselves as federal drug enforcement agents. Such identification does not convert the consensual encounter into a seizure. *See Royer,* 460 U.S. at 497, 103 S.Ct. at 1324 (plurality opinion of White, J.). Finally, although it is true that the agents did not tell appellees that they were free to leave or to refuse to talk to the agents, the encounter as described by Johnson "possessed none of the indicia of force or authority that typically earmark[ ] a Fourth Amendment seizure." *United States v. Barrios–Moriera,* 872

F.2d 12, 15 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989).

The district court made incomplete factual findings regarding the initial encounter because of its view of the governing law. In support of the claim that no seizure occurred, the government relied in the district court on a number of recent District of Columbia Circuit cases that found there was no seizure in circumstances similar to the instant case. *See United States v. Maragh,* 894 F.2d 415 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990); *United States v. Winston,* 892 F.2d 112 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3277, 111 L.Ed.2d 787 (1990); *United States v. Lloyd,* 868 F.2d 447 (D.C.Cir.1989). The district court expressed the opinion that "[i]n view of *Reid v. Georgia* ... these cases were wrongly decided." 739 F.Supp. at 144 (citation omitted).

We believe that the district court's reliance on *Reid* was misplaced. That case raised only the question of whether a DEA agent had reasonable suspicion to stop and question a suspect. The state courts had apparently assumed a seizure had occurred and "addressed only the question whether the agent's actions were justified by articulable and reasonable grounds of suspicion." 448 U.S. at 443, 100 S.Ct. at 2755 (Powell, J., concurring).

Our own cases are consistent with those of the District of Columbia Circuit. In *Barrios–Moriera,* for example, we held that an agent who followed a suspect into the common hallway of an apartment building and pursued him up the stairs to the door of his apartment did not seize the suspect. *See* 872 F.2d at 15. Similarly, in *Moreno,* agents "asked the defendants to 'come over here for a second.'" When one suspect did not comply, an agent displayed his badge and called out to him. *See* 897 F.2d at 28. We held that defendants were not seized and voluntarily agreed to speak to the agents. *See id.* at 30–31. In contrast, in *Ceballos,* we found a seizure where agents went to defendant's place of work, requested that he accompany them to their office in a manner that conveyed a

strong sense of urgency, and compounded the initial impression that the defendant was legally obliged to accompany the agents by denying his request to follow them to the office in his own vehicle. *See* 812 F.2d at 48–49.

■ Despite our ruling that the district court's findings do not support its conclusion that Montilla and Colon were illegally seized, we cannot conclude that the encounter was necessarily consensual. Because of the government's shifting positions and the district court's view of the law, the district court never found whether Johnson's version of events—a simple request to speak with appellees in the non-coercive atmosphere of a public place to which they responded "yes"—was accurate. If so, we believe the initial encounter was consensual and lawful for the same reasons stated in our discussion concerning Colon's consent. If the district court finds Johnson's version of events inaccurate, it should make findings as to what actually occurred, and the appropriate legal principles can then be applied to those facts.[3] We therefore remand for proceedings consistent with this opinion.

---

**3.** If the district court finds that the encounter with appellees constituted an unlawful seizure, it should then consider whether the illegal stop tainted Colon's consent to the search of her bag. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Under *Wong Sun,* an illegal stop would invalidate Colon's consent to the search unless the government bears its burden of showing that the taint of the initial stop had been dissipated before the consent was given. *See Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *United States v. Vasquez,* 638 F.2d 507, 527 (2d Cir.1980); *United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987). In determining whether the taint of an illegal stop has been

dissipated, we consider four factors: whether a *Miranda* warning was given, the temporal proximity of the stop and the consents, the presence of intervening circumstances, and the purpose and flagrancy of the illegal stop. *See Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *United States v. Oguns,* 921 F.2d 442, 446–47 (2d Cir. 1990); *Ceballos,* 812 F.2d at 50. It appears that in the instant case it is extremely unlikely that the government can satisfy its burden of showing that the taint of an illegal seizure had been dissipated before Colon consented to the search. However, given the lack of findings as to the initial encounter, we are unprepared to reach that conclusion as a matter of law.