**UNITED STATES of America, Appellee,**

v.

**Oswaldo URIBE–VELASCO, Defendant–Appellant.**

**No. 1033, Docket 90–1333.**

United States Court of Appeals, Second Circuit.

Argued March 6, 1991.

Decided April 18, 1991.

George A. Stamboulidis, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, Matthew E. Fishbein, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Marjorie M. Smith, New York City (The Legal Aid Soc., Federal Defender Services Unit, New York City, on the brief), for defendant-appellant.

Before KEARSE, PRATT, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Oswaldo Uribe–Velasco ("Uribe" or "Velasco–Uribe") appeals from a final judgment of the United States District Court for the Eastern District of New York, John R. Bartels, Jr., *Judge*, entered on his conditional plea of guilty to one count of possession with intent to distribute in excess of 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii) (1988), and 18 U.S.C. § 2 (1988). Uribe was sentenced principally to 97 months' imprisonment, a four-year term of supervised release, and a $12,500 fine. On appeal, he contends that the district court erred in denying his motion to suppress evidence and that the imposition of the fine was improper. For the reasons below, we vacate the judgment and remand the case for further proceedings in connection with Uribe's motion to suppress.

## I. BACKGROUND

Uribe was arrested on November 21, 1989, outside the three-apartment building in which he lived at 135–11 Coolidge Avenue, in Kew Gardens, New York ("Coolidge building" or "building"). The evidence presented at the suppression hearing as to the background of this arrest, taken in the light most favorable to the government, was as follows.

In the fall of 1989, the United States Customs Service was conducting a money-laundering investigation that focused on one Lorenzo Bitti. On October 25, Bitti, driving a black Mercury, was followed to the Coolidge building. The agents did not know which apartment in the building Bitti visited. On November 1, Bitti was seen driving a black BMW that was leased in his name. On a third occasion, Bitti was observed driving a white Pontiac. On the basis of observations during these surveillances and the ensuing seizures of several million surreptitiously transported dollars, a warrant was issued for Bitti's arrest.

On November 21, New York State Police investigator James McCarthy, Jr., and Customs Agent Thomas DeSimone led a team of agents in a surveillance of the Coolidge building, hoping to execute the arrest warrant. The agents observed the Mercury and the BMW, both previously driven by Bitti, parked in front of the Coolidge building. The agents did not know whether or not Bitti was in the building, but they had reason to believe he was not at any of the other locations at which he had been observed.

McCarthy had had a brief glimpse of Bitti from a distance during an earlier nighttime surveillance; DeSimone had had a better view of Bitti during the November 1 surveillance. The agents had a photograph of Bitti and a description of him received from other law enforcement officers who had questioned him; the description stated that Bitti was "about six foot or over, heavy build, balding, gray hair and light complexion or medium."

At about 8:25 a.m. on November 21, a cold and blustery day, Uribe, whose height is approximately 5' 6½", emerged from the building, dressed in a parka, hat, scarf, and sunglasses. The agents had never seen Uribe before, could not gauge his height,

and could not tell his girth under the heavy clothing. They speculated that he might be Bitti. When Uribe left the building, he first stood near the back of the BMW and looked down the street as if waiting for someone, then he walked several blocks to a pay telephone. After a few minutes, he returned to the building.

Thereafter, the Pontiac previously driven by Bitti arrived; the driver, one Dario Galiano, entered the building. At that point, three of the vehicles associated with Bitti were parked at the Coolidge building. McCarthy inferred that Uribe must be Bitti:

> ... We felt, or I felt, in particular, and I voiced this to Special Agent DeSimone that [Uribe] must have been [Bitti], why would he go back, this is the guy he was waiting for. Now, all three vehicles are here, he's going to be in there.

McCarthy and DeSimone debated whether Uribe was Bitti. DeSimone believed he was too short; McCarthy thought they would have to get a closer view. Uribe and Galiano left the building, entered the Pontiac, and drove away; they soon returned and reentered the building. McCarthy did not attempt to stop Uribe on either this or his earlier sortie from the building because at those times he and DeSimone had no backup, and Bitti was believed to be armed.

Near 11 a.m., having assembled about six other officers for support, McCarthy decided that one of the agents would knock at the door and ask if Bitti was there. Before this plan could be executed, Uribe and Galiano exited the building, and McCarthy decided to confront Uribe directly in order to see how tall he was and ask whether he was Bitti. Accordingly, as Uribe and Galiano were about to get into the Pontiac, McCarthy and another agent approached the two men, with guns drawn though pointed down. McCarthy identified himself as a police officer, had Uribe put his hands on the car, and kept his hand on Uribe's back while questioning him. The other officers had by then come up the street and during the questioning were standing, with their guns drawn, on and near the steps to the building.

McCarthy, who is 6'3" tall, testified that as soon as he stood next to Uribe, who only came up to his shoulder, he realized that Uribe was too short to fit the description of Bitti. He then asked and was told Uribe's name. In response to McCarthy's questions, Uribe stated that he did not know Bitti, denied that Bitti was inside the house, and, according to McCarthy, gave McCarthy permission to enter the apartment and look around. In the apartment, the investigators discovered, *inter alia*, four kilograms of cocaine in a gym bag that was sufficiently open to permit the officers to see wrappings of a type they recognized as commonly used to package narcotics.

Uribe's version as to the confrontation was different. He testified, *inter alia*, that he was accosted only after he and Galiano had entered the car and it had begun moving, that McCarthy held a gun to his head while questioning him, that he never told McCarthy that he did not know Bitti, and that he never consented to the search of his apartment.

At the conclusion of the testimony, the district court ruled that none of the evidence should be suppressed because (1) the stop of Uribe was justifiable as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), (2) Uribe's "statements were either made in response to a non-custodial interrogation or after a knowing and voluntary waiver of his Miranda rights" (Hearing Transcript, February 6, 1990 ("Tr."), 155), and (3) Uribe voluntarily consented to the search of his apartment. Though the government in its prehearing brief had argued principally that the stop was sustainable as a mistaken attempt on the part of the officers to arrest Bitti, the court concluded that this argument was untenable, stating as follows:

> I find that this case is not a case of mistaken arrest. It's a case where there has been a *Terry* stop of a defendant who had been associated with a person strongly suspected to be a felon and who was known to be armed, one, Lorenzo Bitti.
>
> The stop took place in front of the defendant's home, a home the suspected

felon, Mr. Bitti, had many times visited. The officer who made the stop knew this information. They had seen Bitti's cars in front of this address several times. It was a BMW, it was a Mercury, and the other was a Pontiac.

Bitti had used those cars before.

The officers, therefore, had a reasonable suspicion to stop Velasco[-]Uribe and question him concerning the whereabouts of this suspected felon, Mr. Bitti.

Velasco[-]Uribe, upon questioning him as to his identification, and also as to whether Bitti was in his home, gave an oral, voluntary and knowing consent to the officers to search the home for Bitti. (Tr. 153–54.)

Following the denial of his motion, Uribe entered a conditional plea of guilty to one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), and 18 U.S.C. § 2. He was sentenced as noted above, and this appeal followed.

## II. DISCUSSION

On appeal, Uribe contends principally that the district court erred in denying his suppression motion because (1) the record does not support the court's finding that there was sufficient basis for a *Terry* stop of him as an associate of Bitti, and (2) the court erred in finding (a) that Uribe consented to the entry of his home, and (b) that the narcotics were in plain view. He also challenges the court's imposition of a fine. We conclude that there is merit in his first contention, warranting vacation of the judgment and a remand for further consideration of the motion to suppress.

In reviewing a ruling on a motion to suppress, we will uphold the district court's findings of historical fact, *e.g.*, what information the officers had, what acts were performed, and what statements were made, unless they are clearly erroneous. *See, e.g., United States v. Montilla*, 928 F.2d 583, 587–88 (2d Cir.1991); *United States v. Ceballos*, 812 F.2d 42, 47 (2d Cir.1987); *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984). We review *de novo*

such legal issues as whether the information possessed by the officers sufficed to give them reasonable suspicion to stop a suspect or probable cause to arrest him, whether statements made during an interrogation were voluntary, and whether acts and statements of the officers constituted a seizure within the meaning of the Fourth Amendment. *See, e.g., United States v. Montilla*, 928 F.2d at 588 (seizure); *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990) (probable cause to arrest); *United States v. Mast*, 735 F.2d at 749 (statements during interrogation).

We have two principal difficulties with the ruling of the district court in the present case. First, the court's conclusion that the stop of Uribe was justifiable as a *Terry* stop was based on (1) explicit findings that Uribe was associated with Bitti and that Bitti had visited Uribe's home, and (2) implicit findings that the officers possessed this information. The findings that the officers had this information, however, are contradicted by the record. According to McCarthy, no one on the surveillance team knew who Uribe was. He testified, "All the players that were now on the scene were all brand new. We had never seen them before." Further, there were three apartments in the Coolidge building, and the agents neither knew in which apartment Uribe lived nor knew which apartment Bitti had visited. McCarthy testified that though there were three apartments in the building, there was a common outer door, and in a prior inquiry "[n]one of the floors came back in any sort of a check to a Mr. Bitti"; hence the officers in fact "didn't know which of the three floors was involved." Finally, though the record also revealed that on a prior surveillance the agents had seen Bitti with Uribe's daughter, McCarthy testified that they did not know the woman they had seen had any connection with Uribe. Thus, the district court's finding that the agents knew Uribe had been associated with Bitti was clearly erroneous. It could not support the conclusion that this gave them reasonable grounds for a *Terry* stop of Uribe.

Our second difficulty is that the court described the initial treatment of Uribe as

"a non-custodial interrogation." It made no factual findings as to the conduct of the officers in approaching Uribe, however, and it is not clear to us that sustainable findings could be made to support the conclusion that Uribe was not in custody, perhaps even under arrest, before he made any statement whatever. McCarthy described the initial phase of the encounter as follows. "I came up behind Mr. Uribe and put my hand on his back. I said, 'We are police officers.' I told him to put his hands on the vehicle and I asked him his name"; Uribe "[j]ust looked over his shoulder at me, and I said, 'Police. Don't move and put your hands on the vehicle.'" McCarthy kept his hand on Uribe's back while questioning Uribe. When McCarthy first reached Uribe, only one other officer was with him; but eight backup agents arrived on the run and positioned themselves on and around the steps of the building, all with their guns drawn.

 In order to determine whether the officers' warrantless entry into Uribe's home was permissible under the Fourth Amendment, the court was required to determine whether Uribe's consent was voluntary. A determination as to whether Uribe was in custody, though not dispositive, was material to the assessment of voluntariness. *See, e.g., United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976). Factors to be considered in determining whether the officers have imposed a restraint on a suspect's liberty, prompting his reasonable conclusion that he was not free to leave, include "the threatening presence of several officers, the display of a weapon by an officer, [and] some physical touching of the person of the citizen." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *see Michigan v. Chesternut*, 486 U.S. 567, 573–75, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988). Plainly there had been a seizure of Uribe within the meaning of the Fourth Amendment; thus, the court's finding that Uribe's initial statements were made in a noncustodial setting is contradicted by the record. The voluntariness of Uribe's consent, which is to be determined in light of the totality of the circumstances, must be assessed in light of at least the restraints on his liberty to which McCarthy himself testified.

 The government, acknowledging that the basis on which the district court ruled is not sustainable, urges us to affirm the *Terry* ruling on the basis that "the agents had a reasonable and good faith suspicion, based upon articulable facts, that Velasco–Uribe was the person for whom they had an arrest warrant." (Government's brief on appeal at 15.) We conclude that such an affirmance would be inappropriate, given that this was the principal contention of the government below and that the district court explicitly found that this was not a mistaken-arrest case, a finding that is not clearly erroneous. Though McCarthy initially inferred that Uribe was Bitti, DeSimone doubted it, and the agents knew they were speculating; they decided to test their hypothesis by confronting Uribe. McCarthy testified that he came up behind Uribe before Uribe got into the car; when he stood next to Uribe, he knew that Uribe was too short to match the description they had of Bitti. Only after he had this opportunity to gauge Uribe's height against his own did he proceed to pin Uribe to the car, tell him not to move, and question him, thereby obtaining the disputed consent. The district court's finding that the agents' detention of Uribe was not premised on a mistaken belief that he was Bitti is not clearly erroneous, and we will not overturn it.

The district court did not make any finding as to other possible bases for a reasonable suspicion to justify stopping Uribe. Accordingly, we remand for further exploration of the questions material to Uribe's motion to suppress, including (a) whether the stop of Uribe was merely a *Terry* stop or was instead an arrest, (b) whether the agents had the requisite reasonable suspicion or probable cause to support their actions, and (c) whether there was a voluntary consent to the entry of Uribe's home. The court should give the parties an opportunity to adduce such additional evidence

as they may possess with respect to these questions.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of conviction and remand the matter to the district court for further proceedings not inconsistent with this opinion.