996 F.2d 1220
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff/Appellee,
v.
Jose T. VERDUZCO, Defendant/Appellant.
 No. 92-1963.
 United States Court of Appeals, Seventh Circuit.
 Argued June 15, 1993.
Decided June 18, 1993.
 
 Before BAUER, Chief Judge, and CUMMINGS and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Jose T. Verduzco and his brother Juan Raul Verduzco were indicted for possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). They filed a motion to suppress evidence seized from them during a warrantless search. The district court denied the motion. Jose entered a conditional plea of guilty in which he reserved the right to appeal the denial of his motion to suppress, pursuant to Federal Rule of Criminal Procedure 11(a)(2). Jose now challenges the district court's denial of his motion to suppress.
 
 I.
 
 2
 Jose Verduzco and his brother Juan were driving north on Interstate 57 when Illinois State Trooper Gregory Dixon pulled over their truck because their license plate was partially obscured and they were following too closely behind another car. Upon Dixon's request, Jose, the driver, gave Dixon his license and the truck registration. When Dixon asked Juan for identification, Juan gave him a Texas identification card which identified Juan as being 6'3" tall with green eyes. Juan did not fit that description.
 
 
 3
 Dixon asked the Verduzcos if they were illegal aliens, and they said they were not. Jose showed Dixon his social security card and identification for legal residency. Dixon then inspected the truck registration which indicated that the truck was owned by Carlos Gonzales. Dixon asked about the truck's ownership and Jose replied that he had borrowed it from his friend Carlos. Jose did not know Carlos' last name or his address or phone number.
 
 
 4
 Dixon informed Jose that the offenses were minor and that he would probably issue a warning ticket. He returned to his squad car to do a computer search when Illinois Trooper Lindemulder pulled up to assist Dixon. The computer check on Juan showed the existence of an FBI file and no record of a driver's license.
 
 
 5
 Dixon suspected that the Verduzcos were engaged in drug trafficking. Their vehicle was owned by a third party about whom the occupants had no information. They appeared to be driving straight through from Dallas to Chicago. They also appeared more nervous than expected for a routine traffic stop.
 
 
 6
 Dixon wrote up warning tickets and took the tickets and the identification documents back to the truck. Jose signed the warning ticket. Dixon told Jose that the stop was completed and that he was free to leave, but if he had time Dixon wanted to ask him a few questions. Jose agreed to stay.
 
 
 7
 Dixon asked Jose why they were going to Chicago. Jose replied that they were going to see a sick sister. Dixon then asked Jose to speak with him outside the truck because he wanted to ask some questions that Jose might not want his brother to hear. Dixon showed Jose how to fix the tow ball so it would not obstruct the license. Then he asked why Juan had an FBI file. Jose replied that he thought it had something to do with guns. Dixon asked Jose if he had any guns in the truck. Jose denied having guns and extended his hands palms upward and told Dixon he could look. Dixon then asked if he had drugs. Jose looked down and said that he did not. Dixon asked about guns again and told Jose he did not have to let him look. Jose again answered that he had nothing to hide and to go ahead and look.
 
 
 8
 Dixon informed Lindemulder they had consent to search the truck for contraband and weapons. They asked Juan to get out of the truck while they searched the cab of the truck. They did not find contraband in the cab. Dixon next searched the tool box, which covered the length of the truck bed. The tool box was locked, but Jose indicated they could search. The box contained an overnight bag and some screws that looked like they had come from the liner in the bed of the truck. Dixon then retrieved a blanket from his car and looked under the truck. He noticed that the spare tire was larger than the four tires that were mounted on the truck and its moorings. Dixon pressed on the air valve, and no air escaped. He thumped the tire and the sound indicated there were objects inside. Lindemulder checked the tire and agreed.
 
 
 9
 When the canine officer arrived with his dog, he walked the dog around the truck at Dixon's request. The dog alerted, barking and scratching at the truck near the fuel cap. Dixon told Jose what the dog had done, and informed him that he was interested in the spare tire. Lindemulder found a crank in the truck and lowered the tire while Dixon lay underneath the truck and caught the tire as it came down. The dog approached the tire and gave a very positive alert which consisted of barking, scratching and licking the tire.
 
 
 10
 Dixon then took a pry bar and tried to pry the tire off the rim, accidentally puncturing the tire itself. Upon pulling the pry bar from the tire, he saw that the tip was covered with white powder and crystal. A field test revealed that the powder was cocaine. The officers opened the tire enough to inspect the inside with a flashlight; they could see six to eight packages inside. Jose and Juan were placed under arrest for possession of cocaine.
 
 
 11
 The police at the Douglas County Sheriff's office opened the tire and found ten bricks of cocaine. Because of the dog's alert on the truck and the extra liner screws, the police also removed the bed liner and discovered twelve additional bricks of cocaine.
 
 
 12
 Dixon testified that neither he nor any of the other officers drew a weapon during the stop. He described his conversations with Jose as being casual and low-keyed. Jose never indicated that he did not understand Dixon and he always spoke English to Dixon. The entire encounter had taken no more than one-half hour.
 
 
 13
 Douglas County Corrections Officer Gary Melton, who had booked Jose and Juan, saw them sporadically during their seven-day stay. He testified that Jose followed verbal commands properly and answered questions in English. Melton also testified to conversations in English between himself and Jose. Jose never indicated that he did not understand Melton or that he could not speak English.
 
 II.
 A. Voluntary consent
 
 14
 It is well settled that an officer does not need a warrant or probable cause to conduct a search if the defendant has voluntarily consented to the search. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Whether consent to search is voluntary "is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. The government bears the burden of proving that consent was freely and voluntarily given by a preponderance of the evidence, United States v. Duran, 957 F.2d 499, 502 (7th Cir.1992) (citing Schneckloth, 412 U.S. at 222), and an appellate court reviews the district court's finding only for clear error. Id. (citing United States v. Talkington, 843 F.2d 1041, 1047 (7th Cir.1988)).
 
 
 15
 Verduzco argues that the warrantless search was conducted in violation of the Fourth Amendment because he did not give voluntary consent. Verduzco claims that he does not speak English and that he was unable to understand and comprehend his rights. At the suppression hearing, Verduzco testified, through an interpreter, that he understood only a few words of English and had not understood what was happening during the stop. He argues that in the absence of an interpreter at the scene of the stop who could have explained his rights, the government failed to carry its burden of proving that he gave voluntary consent.
 
 
 16
 Based on the testimonies of Dixon and Melton, the district court found that Jose could speak and understand English well enough to understand what Dixon was saying to him during the stop. The court explained that its acceptance of the officers' testimony was based on its determination that Verduzco and his relatives were not credible witnesses. The court explained that Verduzco's testimony was not believable and that his relatives were motivated to testify that Verduzco did not understand English.
 
 
 17
 Appellate courts do not reevaluate the witnesses' credibility or the weight given their testimony. United States v. Durades, 929 F.2d 1160, 1164 (7th Cir.1991). This court will not reverse a credibility finding absent a conclusion that the trial court's findings are clearly erroneous. Id.; see United States v. McGuire, 957 F.2d 310, 314 (7th Cir.1992). A "trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony." United States v. Cardona-Rivera, 904 F.2d 1149, 1152 (7th Cir.1990).
 
 
 18
 The district court was persuaded by the testimony of the officers that Jose never indicated a lack of understanding. Jose himself admitted that he understood some English. He has lived in the United States since 1985. A defendant does not have to have perfect command of the English language in order to give voluntary consent; it is enough that he understand English well enough to comprehend the situation.[1] This may be shown by evidence that the defendant conversed with troopers in English, United States v. Garcia, 897 F.2d 1413, 1419; United States v. Alvarado, 898 F.2d 987, 991 (5th Cir.1990) ("where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper"), evidence that troopers never had to repeat questions which were asked in English, United States v. Gutierrez-Mederos, 965 F.2d 800, 803 (9th Cir.1992), cert. denied, 113 S.Ct. 1315 (1993), and evidence of the defendant's ability to relate the needed information in English, United States v. Corral, 899 F.2d 991, 994 (10th Cir.1990).
 
 
 19
 Trooper Dixon testified that he had several conversations with the Verduzcos in English and that he asked them to perform certain tasks. Dixon asked where they were headed, and Jose stated they were going to Chicago. (Tr. at 12). When he asked for Jose's driver license and vehicle registration, Jose produced the requested documents. (Tr. at 12-13). Dixon asked Jose and Juan if they had social security numbers and if they were illegal aliens, and Jose produced a resident alien ID card and a social security number. (Tr. at 17). When Dixon asked about the ownership of the truck, Jose stated that he had borrowed it from Carlos, a friend. (Tr. at 22). Further questioning revealed that Carlos was in Dallas and that Jose did not know how to reach him. Dixon asked Jose why they were going to Chicago, and Jose replied that they were going to see a sick sister. (Tr. at 30). Dixon asked Jose why Juan had an FBI file, and Jose indicated that it might be for guns. (Tr. at 32). Dixon asked Jose about the flat spare tire, and Jose said that they had changed the tires earlier in the trip. (Tr. at 43-44).
 
 
 20
 Melton also testified to having lucid exchanges with Jose. He gave Jose verbal commands in English and Jose properly followed directions. (Tr. at 96). During strip search procedures, Jose answered Melton's questions in English. Melton also had conversations with Jose about procedures for making phone calls and going to church, and Jose followed those procedures. (Tr. at 99).
 
 
 21
 Jose presented some evidence at the hearing that he had limited knowledge of English. Speaking through an interpreter at the suppression hearing, Jose testified that he had not understood what Dixon said to him during the stop. He claimed that he gave Dixon his license because he did not understand English. He also testified that he answered yes to all Dixon's questions even though he did not understand exactly what he was saying. Jose's relatives testified that he never speaks English with family members. They also gave limited examples of certain occasions when Jose had difficulty communicating with others.
 
 
 22
 Jose's examples were insufficient to persuade the district court that he did not understand enough English to give voluntary consent to search. By accepting the officers' extensive testimonies of exchanges with Jose, the district court was not crediting exceedingly improbable testimony. Jose's responses were consistent with those of a person who understood what was happening.
 
 
 23
 Jose's voluntary consent was further emphasized to Dixon when Jose invited the troopers to search. Dixon asked if they were carrying guns and Jose said twice, "No, you can look." (Tr. at 32). Dixon then asked whether he had cocaine or marijuana, and Jose replied, "No, I do not. You can look. I have nothing to hide. You can look." (Tr. at 32). Dixon testified that he repeated his question and that Jose again replied that he had nothing to hide. A defendant's invitation to search is indicative of voluntary consent. United States v. Quinones-Sandoval, 943 F.2d 771, 775 (7th Cir.1991).
 
 B. Scope of consent
 
 24
 Verduzco argues that even if the officers had consent to search the interior of the truck and the tool box, that consent did not extend to the search of the tire. He argues that because the officers requested a drug-sniffing dog, they intended to rely on probable cause because they did not have consent. This argument fails.
 
 
 25
 Whether the officers had consent to search the tire under the truck is determined by the scope of the consent. The scope of a consent search is limited by the breadth of the actual consent. Garcia, 897 F.2d at 1419 (citing United States v. Gay, 774 F.2d 368, 377 (10th Cir.1985)). The standard for determining the scope of consent under the Fourth Amendment is that of objective reasonableness--what a reasonable person would have understood by the exchange between the officer and the suspect. Florida v. Jimeno, 111 S.Ct. 1801 (1991) (citing Illinois v. Rodriguez, 110 S.Ct. 2793, 2798-2802 (1990)). In Jimeno, the defendant granted an officer permission to search his car and did not place explicit limitation on the scope of the search. The officer opened a closed container, a paper bag, in his search for narcotics. The Supreme Court determined that it was objectively reasonable for the police to conclude that the general consent to search the car included consent to search containers in car which might bear drugs. The officer was not required to request separate permission to search containers because the Court found "no basis for adding this sort of superstructure to the Fourth Amendment's basic test of objective reasonableness." Id. at 1804.
 
 
 26
 Assuming the officers had consent to search the cab of the truck and the tool box, that consent would extend to an examination underneath the car. The underside of the truck is part of the truck; no restrictions were placed on the search. Verduzco never objected to the search underneath the truck. Failure to object to the continuation of the search may be considered an indication that the search was within the scope of consent. United States v. Pena, 920 F.2d 1509 (10th Cir.1990), cert. denied, 111 S.Ct. 2802 (1991). Looking at the underside of the truck, thumping the tire and checking the air were also within the scope of consent.
 
 C. Probable cause for warrantless search
 
 27
 Verduzco's final argument is that the officers lacked probable cause to search the tire. Warrantless, nonconsensual searches of motor vehicles on public highways do not violate the Fourth Amendment if the officers conducting the search have probable cause to believe the vehicle contains contraband. United States v. Spears, 965 F.2d 262, 268 (7th Cir.), cert. denied, 113 S.Ct. 502 (1992) (citing California v. Carney, 471 U.S. 386 (1985)). Probable cause is determined by the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213 (1983). We review probable cause for clear error. Spears, 965 F.2d at 269.
 
 
 28
 Although consent extended to the search of the underside of the truck and the outside of the tire, the officers probably needed probable cause in order to examine the inside of the tire. In Garcia we determined that the search of the interior of the car door was not within the scope of consent, but that there was probable cause to search. Garcia, 897 F.2d at 1419-20. Probable cause arose in Garcia because the officer noticed the lack of door handles and the ill-fitting and mismatched screws on the door panel. Id. at 1420. The same analysis applies here. Dixon realized from the sound of the tire that there was something inside the tire. Dixon could see that the spare tire was not the right size and that it had scrape marks near the rim. The dog, which had been summoned before the search began, gave a positive alert, indicating that there were probably drugs inside the tire. This combination of factors gave the officers probable cause to search the inside of the tire.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 There was some indication that Jose was not entirely proficient in the English language. Melton acknowledged that when the Verduzcos were booked, Lindemulder had told him that they spoke a little English. Furthermore, the probation officer recommended in the presentence investigative report (PSI) that Jose learn English upon his release. In its final order the court agreed that Jose "make reasonable effort to learn the English language." This is not inconsistent with the determination that Jose understood enough to give voluntary consent