**UNITED STATES of America**

v.

**Elvin JAVIER and Jorge Santiago.**

**Crim. No. 3:94CR201(AHN).**

United States District Court,
D. Connecticut.

April 10, 1995.

Alex V. Hernandez, Office of the U.S. Atty., Bridgeport, CT, for plaintiff.

Gerald E. Bodell, Stratford, CT, for defendant Santiago.

John T. Walkley, Trumbull, CT, for defendant Javier.

*MEMORANDUM OF DECISION
ON DEFENDANT JAVIER'S
MOTION TO SUPPRESS*

NEVAS, District Judge.

Defendants Elvin Javier ("Javier") and Jorge Santiago ("Santiago") are charged with violating 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute and to possess with intent to distribute cocaine base). Both defendants filed motions to suppress evidence seized during a search of their apartment at 100 Mark Lane, Apartment D–8, Waterbury, Connecticut. On April 4, 1995, at the close of the suppression hearing, the court orally denied the motions and then placed on the record its findings of fact and conclusions of law as to Santiago's motion. This memorandum of decision sets forth the court's findings of fact and conclusions of law with respect to Javier's motion.

*FINDINGS OF FACT*

The following findings of fact are drawn from the testimony of FBI Special Agent William Reiner, Jr. ("Reiner"), Officer Paul Ezzo ("Ezzo"), Officer Charles LeStage ("LeStage"), Officer Juan Rivera ("Rivera"), Trooper Cheryl Shaggy ("Shaggy"), Annette Miranda, Ada Miranda, Dr. Julia Ramos Grenier, and defendant Santiago. The court sets forth only those facts that pertain to the resolution of the legal issues presented.

Javier and Santiago were arrested and taken into custody on September 24, 1994, at approximately 5:50 pm, having been apprehended while selling drugs to a confidential informant. When they arrived at the FBI office in Waterbury, Connecticut, Reiner orally advised them, in English, of their Miranda rights. Both defendants indicated that they understood their rights.

Santiago was taken to an interview room for questioning by Reiner and Special Agent John Howell while Javier remained in the front room with Trooper Shaggy. Shaggy, speaking only in English, elicited biographical information from Javier.

When Reiner finished questioning Santiago, he and Agent Howell brought Javier to the interview room, a "smallish" room containing filing cabinets and a table. Javier, who was not handcuffed, sat at the table. Reiner again advised Javier, in English, of his Miranda rights. He then gave Javier two Miranda rights waiver forms, one in English and one in Spanish. Reiner read the English

form aloud to Javier and Javier read the Spanish form aloud to Reiner. Javier signed both forms. (Exs. 12, 12a.)

Reiner then asked Javier about his involvement in the incident for which he was arrested. The conversation took place in English and lasted approximately ten minutes. At the end of the interview, Reiner asked Javier if he would consent to a search of his apartment. Reiner explained that Javier was not required to consent, and that, if he did not consent, the police would be required to obtain a search warrant from a Judge or Magistrate. Reiner then showed Javier a pre-printed English-language consent to search form, and asked Javier if he would be more comfortable if Reiner read the form read aloud to him. Javier responded affirmatively and Reiner complied.[1] No threats or promises were made. Javier signed the form. (Ex. 7a.)

According to the testimony of Reiner and Shaggy, from the time Javier arrived at the FBI office through the time that he signed the consent form, he never indicated that he did not understand what was being explained to him or asked of him. He neither asked any questions nor appeared to have trouble answering the questions posed to him. He did not ask Reiner or Shaggy to repeat anything or to speak more slowly. At several points, Javier affirmatively indicated that he did understand.

At approximately 8:30 pm on September 28, 1994, Agent Reiner and seven other officers knocked and announced their presence at 100 Mark Lane. The door was opened by Annette Miranda, Santiago's girlfriend. Agent Reiner told Annette Miranda and her sister Ada Miranda that Javier and Santiago had been arrested and that they had been given permission to search. As a result of

the search, $8,300.00 in cash was seized from Javier's bedroom. Of this amount, $2,200.00 was located in an attic space in Javier's closet, and $6,100.00 was found in a sock in a bag of clothes in Javier's closet.

In addition to the money, the agents seized a backpack containing various documents and letters. Most of the letters (*see* Exs. 13, C) were English-language letters from Javier's then-girlfriend, Saira Heredia ("Heredia"), to Javier. A few of the letters appear to have been written by Javier; these letters are written in Spanish. In one letter Heredia writes: "I'm only going to talk Spanish now because I need to learn to speak Spanish so don't speak to me in English." (*Id.*) In another she writes: "I know you like your letters in Spanish." (*Id.*) Also among the documents seized is a copy of Javier's high school transcript which indicates that most of his courses were "bilingual," meaning, the court assumes, that they were taught in both English and Spanish. (*See* Ex. C.)

The court also heard testimony from Dr. Grenier, a licensed clinical psychologist, who evaluated Javier at the request of defense counsel. (*See* Ex. D.) The purpose of the evaluation was to assess Javier's ability to understand Spanish and English, and legal terminology in particular. Dr. Grenier obtained some background information from Javier, establishing that he is twenty years old, was born in the Dominican Republic, and has been in the United States since 1991. (*Id.* at 1.) Dr. Grenier conducted several tests from which she concluded that Javier's intellectual functioning, as measured by his IQ, is average for an Hispanic male. (*Id.* at 4.) His language skills, however, are below average. His Spanish-language skills (oral, reading and writing) showed "significant deficits" and fell at about a third to fifth grade

---

1. On cross examination, counsel for Javier elicited the following testimony from Reiner:

I told [Javier] we would like to search the apartment in which he resides. We talked during—this was done at the end of the interview. During the interview he had told me where he lived, he had told me that he paid an equal share of the rent and who he lived with. I told him that at the end I would like to search this apartment. Asked him if there was anything in the apartment. He said there was not. I said—then I took out the form, I asked

him if he would feel more comfortable if I read the form aloud to him. He said he would. I read the form out loud to him, then explained to him he didn't have to sign it. He could make us get a search warrant which would have—we'd have to go to a Judge or Magistrate for. And I asked if he understood that. He said he did and he signed the form.

Reiner also stated on direct examination that, before Javier signed the consent form, he told Reiner that he had nothing to hide.

level. (*Id.* at 5.) His English-language skills "revealed even more significant impairment" with some of his scores falling at a kindergarten level. (*Id.*) Dr. Grenier hypothesized that the discrepancy between his intellectual capacity and his actual functioning might be attributed to an undiagnosed learning disability. (*Id.* at 6.)

In addition to the standardized tests she conducted, Dr. Grenier also assessed Javier's ability to understand the English-language consent to search form that Reiner had read aloud to him. (*Id.*) Dr. Grenier asked Javier to translate the document into English, and she recorded those words he was unable to translate. (*Id.*) Among the words Javier could not translate were "search," "premises," "refuse," "located," "threats," and "promises." (*Id.*) Among the words and phrases Javier could translate were "informed of my constitutional rights," "special agents of the FBI, United States Department of Justice," "agents are authorized by me to take from my ... some letters, paper, materials, or property," "permission," and "voluntary." (*Id.*) Dr. Grenier also recounted that Javier told her that he "generally understood that they wanted something from him, [but] he did not know that this would include a search of his home[,]" although after he signed the form he understood that "with this paper they could go to his house and break everything." (*Id.*) In addition, Javier reportedly told Dr. Grenier that he recalled saying "yes" to everything that the law enforcement officers asked him because he wanted to "get on their good side." (*Id.*)

Dr. Grenier also testified that the consistency of Javier's scores on the standardized tests she administered indicated that he was not malingering. (*Id.* at 7.) In response to a question by the court, Dr. Grenier testified that it is possible (although not her opinion) that, when asked to translate the consent to search form, Javier tailored his responses to achieve a favorable result.

The court also heard testimony from Ezzo, LeStage and Rivera concerning contact they had with Javier before the September 28, 1994 incident. Each testified that he believed that Javier could speak and understand English. Ezzo testified that Javier followed basic verbal commands given in English, such as "raise your hands" and "lie down." LeStage testified that he read Javier his Miranda rights in English and that Javier said he understood his rights. Rivera, who is fluent in Spanish and English, testified that he had spoken briefly with Javier on approximately five occasions in the course of narcotics investigations and that they spoke in Spanish during only the first of those encounters. Rivera characterized Javier's English as "good." None of these prior conversations with Javier involved a consent to search.

## STANDARD

To justify a warrantless search based on consent, the government must prove by a preponderance of the evidence, *see Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986), that the defendant's consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973). "Voluntariness is a question of fact[,]" *Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2059, and the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226, 93 S.Ct. at 2047. Among the factors to consider are the alleged consenting person's "age, education, intelligence, length of detention, use of physical punishments or deprivations, and whether [he] was advised of his constitutional rights." *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *see also Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047. The Second Circuit "has steadfastly avoided the adoption of any criterion that, in and of itself, would mandate a finding of involuntariness and thereby undermine a thorough analysis of all the relevant circumstances." *United States v. Bye*, 919 F.2d 6, 9 (2d Cir.1990).

## DISCUSSION

Javier argues that his consent to the search of his apartment was invalid. Specifically, he contends that his limited ability to speak and understand English prevented him

from voluntarily consenting.[2] The court disagrees.

Most of the factors to be considered weigh in favor of a finding of voluntariness. Although Javier was in custody at the time his consent was requested, *see Schneckloth,* 412 U.S. at 240 n. 29, 93 S.Ct. at 2055 n. 29 (noting that several "courts have been particularly sensitive to the heightened possibility for coercion when the 'consent' to a search was given by a person in custody"), none of the circumstances surrounding the interrogation suggests that Javier was coerced into consenting to the search. The questioning took place in a relatively unthreatening environment, over a short period of time, and the record contains no evidence of intimidation, overreaching, punishment, or deprivation. Javier was advised of his *Miranda* rights several times. In addition, Javier was informed that he did not have to consent to the search. *Schneckloth,* 412 U.S. at 249, 93 S.Ct. at 2059 (noting that knowledge of the right to refuse consent is a factor to consider in the voluntariness inquiry).

Many of Javier's personal characteristics also weigh in favor of finding that his consent was voluntarily given. He is twenty-years old and has had some high school education. Although he is not native born, he has lived in this country for approximately four years. In addition, he has had prior contact with law enforcement. To all appearances, Javier was neither agitated nor confused at the time of his questioning. Reiner testified that there was no indication that Javier was intoxicated or under the influence of narcotics or that he lacked mental capacity. Moreover, all of Javier's actions and responses indicated that he understood what was being asked of him.

Javier, relying primarily on the testimony of Dr. Grenier, argues that his inability to understand English at a level sufficient to have understood the consent form outweighs all of these other factors. The government, pointing to the testimony of law enforcement agents who spoke with Javier in English, the letters written by Heredia to Javier in English, and Javier's own conduct, argues that Javier understands English well enough to have voluntarily consented.

The court finds that Javier understands English well enough to have voluntarily consented to the search of his apartment. The court has carefully considered the witnesses' testimony, and it is persuaded that Javier comprehended Reiner's questions and comments and understood what was being asked of him. Although the court credits law enforcement's account, *see United States v. Hernandez,* 5 F.3d 628, 633 (2d Cir.1993) (district judge entitled to believe government agent's version of events), it simultaneously credits most of Dr. Grenier's account as well. The court assumes that Dr. Grenier's assessment of Javier's language skills, as measured by the standardized tests, is accurate. It is not persuaded, however, that Javier's translation of the consent to search form is a reliable measure of his English-language proficiency. The court finds it improbable that Javier did not understand "refuse," "promise," "threat" and "search"; it is much more likely that Javier understood that it would be to his advantage to tailor his responses by denying knowledge of these words.[3] In the court's view, there are deficiencies in Javier's language skills that can be detected through tests administered by a licensed professional, but that are not "easily ascertainable" by law enforcement.[4] *See United States v. Ceballos,* 812 F.2d 42, 48 n. 4 (2d Cir.1987).

Javier puts much weight on his purported inability to understand the word "search."

2. Javier also argues that Annette Miranda, Santiago's girlfriend and a co-tenant, did not have authority to consent to the search of his bedroom, closet or bookbag. The court agrees with Javier that Miranda's consent, although valid, did not extend to those locations. Because the court finds that Javier's consent was valid, however, it need not address this argument further.

3. As to the letters, the court finds that they are largely inconclusive. While it appears that Heredia is more comfortable writing in English and

Javier prefers his letters in Spanish, the letters are not probative of Javier's ability to understand English. While the court assumes that, if Javier understood no English, Heredia would not have written so many lengthy letters in English, the court has no way of ascertaining the extent to which Javier understood the letters' content.

4. The court notes that Dr. Grenier testified that it was quite possible that Javier's language deficiencies would not have been apparent to the officers who spoke with him.

The court has already noted that it considers the results of the translation exercise suspect. In addition, the court finds that even if Javier did not understand the term "search," his consent to the search of his apartment was nonetheless voluntary. In *United States v. Montilla*, 928 F.2d 583, 587 (2d Cir.1991), the Second Circuit reversed the district court's finding that defendants Montilla and Colon did not voluntarily consent to a search of their luggage. When DEA agents asked if they could "[take] a quick look through your bags[,]" Colon had answered "yes" and Montilla had nodded his head. *Id.* at 587. The district court was troubled that the agents had not used the word, "search," and by the fact that Colon was " 'primarily a Spanish-speaking individual' " whose "yes" response might not have indicated consent to search. *Id.* (quoting *Montilla*, 739 F.Supp. 143, 145 (W.D.N.Y.1990)). In reversing, the Second Circuit stated: "Whether avoiding the word 'search' or requesting a 'quick look' might be viewed as 'offhand' is beside the point in view of the fact that the agents unambiguously informed [the defendant] that they were looking for narcotics and that they wished to look through the bags." *Id.* The Second Circuit also observed that Colon "spoke primarily in English at all relevant times and no one testified that she had any difficulty understanding questions or framing answers." *Id.*

Following *Montilla*, the court finds that it is not critical whether Javier understood the meaning of the word "search" as long as he understood from his entire interaction with Reiner that Reiner was seeking his permission to allow the FBI to look for evidence of drug trafficking in his apartment.[5] The record is clear that there was more to Reiner's interaction with Javier on the issue of consent than simply reading the consent to search form, (*see supra* note 1), and the court finds that Javier did understand that the FBI wanted to go to his apartment to look for evidence of narcotics activity.[6]

A case from the Eastern District, *United States v. Jaramillo*, 841 F.Supp. 490 (E.D.N.Y.1994), gives further support to the court's determination that it would be inappropriate to allow Javier's supposed inability to understand the consent form to determine the voluntariness of his consent. Jaramillo, a Spanish-speaker, argued that his consent to the search of his apartment was involuntary because the pre-printed Spanish-language consent form he was given to sign began with the words, "It has been required of me that I give my consent to a search of my apartment" and because the word "refuse" was so blurred as to be practically illegible. *Id.* at 490. A certified Spanish interpreter testified as a defense witness at the suppression hearing and stated that the form was confusing and misleading. *Id.* at 491. She also "testified to numerous misspellings, inaccuracies, and bad Spanish in the form." *Id.* at 492. "In short, if a second grader in a Spanish-language course in grammar school had written the form they would be graded with an 'F.' " *Id.*

> My primary concern though, and not just his understanding his understanding or not understanding specific words—*it is clear from this translation that he had something of a gist of what was being said even though he wasn't quite sure of everything*—is that if he did understand this document he didn't have to sign it and so why in the world if he understood it would he sign it and if he didn't understand it that explains why he would have signed it. While Dr. Grenier might not understand why Javier would have signed the consent form if he understood its implications, "it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." *United States v. Price*, 599 F.2d 494, 503 (2nd Cir. 1979) (citation omitted).

**5.** Javier also claimed not to understand the word "premises" in the consent to search form. Even if the court were to be persuaded Javier did not understand the word "premises," it is undisputed that his address was on the form as the place to be searched and Javier's own remarks, as reported by Dr. Grenier, indicate that he realized that as a result of signing the form the officers could now go to his home. (*See* Ex. D.) The court finds that Javier need not have understood the word "premises" because it is clear from the record he understood from the preceding conversation with Reiner that the search was to take place in his apartment.

**6.** The court also thinks it significant that Dr. Grenier was of the opinion that Javier was able to understand "something of a gist of what was being said" solely from the reading of the consent form. She testified:

The district court held that Jaramillo's consent was voluntary because he "was not coerced into giving *oral* consent to the search." *Id.* at 492 (emphasis added). The court notes that "the defendant testified that he gladly opened the door when advised that the police had knocked and that he gave consent because he had nothing to hide." *Id.* Moreover, the "defendant testified that he told the agents that he had 'no problem' with the agents making a search." *Id.* It was only after this interaction that Jaramillo was given the defective and misleading form.

Javier, like Jaramillo, was asked by Reiner if he would give the police permission to search. Javier was asked if there was anything in the apartment and responded that he had nothing to hide. (*See supra* note 1.) Javier, as reported by Dr. Grenier, was only too willing to cooperate. Absent any evidence that Javier's consent was not freely given, the court finds that he, like Jaramillo, effectively gave oral consent before he signed the consent to search form. *See also United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.), *cert. denied,* 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990) (finding based on all the circumstances that defendant Moreno voluntarily consented to search of apartment and vehicle despite that "the hearing testimony raised an issue as to [his] ability to express himself fully in English.").

Courts from other circuits have also been asked to decide whether a person with a limited ability to understand English can voluntarily consent to a search if asked only in English and have answered that question in the affirmative. These cases are instructive because in each the court looked to the circumstances surrounding the defendant's alleged consent and concluded that the defendant's conduct belied his claimed inability to understand English.

In *United States v. Verduzco,* No. 92–1963, 1993 WL 213749, 1993 U.S.App. LEXIS 14972 (7th Cir. June 18, 1993), for example, the Seventh Circuit affirmed the district court's determination that the defendant, who was not proficient in English, voluntarily consented to the search of his truck. The defendant testified through an interpreter at the suppression hearing that he could only understand a few words of English. *Id.* 1993 WL 213749, at *3, 1993 U.S.App. LEXIS 14972, at *7. Law enforcement officers testified, however, that the defendant "followed verbal commands properly and answered questions in English." *Id.* at *2, 1993 U.S. Lexis 14972, at *6. One officer testified that he had had a conversation with the defendant in English, and that the defendant never indicated that he could not understand what was being said. *Id.* The district court found that the defendant's testimony was not credible, and "was persuaded by testimony . . . that Jose never indicated a lack of understanding." *Id.* at *3, 1993 U.S.App. Lexis 14972, at *8.

The Seventh Circuit acknowledged that "[t]here was some indication that the defendant was not entirely proficient in English," *id.* at *5 n. 1, 1993 U.S.App. Lexis 14972, at *8 n. 1, but affirmed, stating that "[a] defendant does not have to have perfect command of the English language in order to give voluntary consent; it is enough that he understood English well enough to comprehend the situation." *Id.* at *3, 1993 U.S.App. Lexis 14972, at *8. The Seventh Circuit agreed that evidence that the defendant spoke with the officers in English, that the officers never had to repeat questions, and that the defendant was able to answer questions in English was sufficient to establish that he understood English well enough to give his voluntary consent to search. *Id.* at *3, 1993 U.S.App. Lexis 14972, at *8–9. The court concluded that the defendant's "responses were consistent with those of a person who understood what was happening." *Id.* at *4, 1993 U.S.App. Lexis 14972, at *12.

In *United States v. Corral,* 899 F.2d 991 (10th Cir.1990), defendant Valdez argued that he could not have consented to the search of his vehicle because he does not understand English. *Id.* at 994. The highway patrol sergeant who conducted the search testified that Valdez had appeared to understand the questions posed to him in English and that Valdez had responded in English to questions about where he had been and where he was heading. *Id.* at 993. Valdez, however, argued that he understood no English and denied having had a conver-

sation with the officer. Valdez's co-defendant corroborated Valdez's testimony. *Id.* On rebuttal, a DEA agent testified that Valdez had given biographical information in English and had complied with verbal commands but that Valdez's co-defendant had had to answer a question for Valdez that Valdez did not understand. *Id.* On this record, the district court found that Valdez had at least a working knowledge of English and voluntarily consented to the search of the car. *Id.* The Tenth Circuit affirmed. *Id.* at 994.

Similarly, the Fourth Circuit in *United States v. Calle–Betancourt,* No. 91–5368, 1992 WL 48026, 1992 U.S.App. LEXIS 5247 (4th Cir. Mar. 16, 1992), held that the district court's finding that the defendant "possessed sufficient English-language skills to render voluntary consent" was supported by the record and not clearly erroneous. *Id.* 1992 WL 48026, at *3, 1992 U.S.App. Lexis 5247, at *9. The court found that the record reflected that the defendant "readily responded" to most of the questions that were posed to him in English by the agents and that the agents were able to communicate with him without gesturing. *Id.* at *3, 1992 U.S.App. Lexis 5247, at *10. The court also observed that the defendant did not tell the Spanish-speaking officer who questioned him later that he did not understand the agents' request to search his suitcase, and cited the defendant's statement that he had permitted the search because he thought the suitcase contained clothes and not cocaine. *Id.*

The defendant in *United States v. Chaidez,* 906 F.2d 377 (8th Cir.1990), argued that his consent to search was involuntary because, although he could communicate orally in English, he "had, at best, a limited ability to understand written English" and he had only been shown an English version of the consent to search form. *Id.* at 379. The district court denied Chaidez's suppression motion, finding that he could communicate adequately to convey his oral consent and, in addition, that his actions bespoke his consent. *Id.* at 380. The Eighth Circuit affirmed. *Id.* at 381. *See also United States v. Bueno,* 21 F.3d 120, 126 (6th Cir.1994) (rejecting defendant's argument that his inability to understand English precluded his voluntary consent); *United States v. Aguilar Guerrero,* No. 92–30120, 1993 WL 272523, at *1, 1993 U.S.App. Lexis 18823, at *3 (9th Cir. May 4, 1993) (upholding district court's conclusion that the Spanish-speaking defendant was "attempting to pass himself off as someone who did not understand English" and affirming district court's conclusion that defendant voluntarily consented to the search of his truck).

This court is persuaded, as were the courts in the cases discussed above, that Javier's "words and actions indicated that [he] consented to the search." *Montilla,* 928 F.2d at 587. The record reflects that Javier had verbal exchanges with Reiner, Shaggy, and Rivera, and not once did he indicate that he did not understand. To the contrary, he consistently indicated his consent and comprehension. Although Javier's primary language may well be Spanish and not English, and while it would certainly have been preferable for Javier to have been provided with a Spanish-language consent to search form, neither of these facts precludes the court's finding that Javier understands English well enough to give his voluntary consent.

Considering the totality of the circumstances, the court is convinced that the government met its burden of demonstrating that, more likely than not, Javier understood that he was giving the FBI permission to search his home for evidence of narcotics activity and voluntarily consented to that search. *See United States v. Rosa,* 17 F.3d 1531, 1542 (2d Cir.) ("To establish a fact by a preponderance of the evidence means simply to prove that the fact is more likely true than not true."), *cert. denied without op.,* —— U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994). The court holds that Javier's consent was voluntarily given and therefore declines to suppress the evidence seized.

## CONCLUSION

It was for the foregoing reasons that, on April 4, 1995, the court denied Javier's Motion to Suppress.