**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kim L. McGUIRE, Defendant–Appellant.**

**No. 90–1422.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1991.

Decided Feb. 18, 1992.

Frances C. Hulin, Asst. U.S. Atty. (argued), Danville, Ill., Rodger A. Heaton, Asst. U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Daniel Brown (argued), Danville, Ill., for defendant-appellant.

Before CUDAHY and MANION, Circuit Judges, and REYNOLDS, Senior District Judge.[*]

MANION, Circuit Judge.

Kim McGuire was indicted and convicted of one count of knowingly and intentionally possessing cocaine with the intent to distribute, 21 U.S.C. § 841(a)(1), and one count of conspiracy to possess cocaine with the intent to distribute, 21 U.S.C. §§ 841(a)(1), 846. The district court sentenced McGuire under the Sentencing Guidelines to 96 months incarceration and six years supervised release. McGuire appeals both his conviction and his sentence. For the reasons set forth below, we affirm.

## I. Background

McGuire was a middle-level cocaine dealer in Danville, Illinois. From March, 1989 until he was arrested on May 6, 1989, once or twice a week, McGuire obtained four to eight ounces of cocaine from a Chicago dealer named Larry King. On some occasions, McGuire would drive to Chicago himself; this kept his costs down and enabled him to pass on the savings to his friends.[1] On other occasions, McGuire would have Ivory Omus or Leopold Davis drive to Chicago and pick up cocaine from King. There were also two couriers from Chicago—Herman Foreman and "Snoot"—who would drive down to Danville and deliver cocaine to McGuire. McGuire sold his cocaine to at least five customers: Ty Welsch, Bob Chandler, someone known as "G.I.," a man known as "Sam," and a relative named Willard.

On May 5, 1989, McGuire made his last trip to Chicago. He purchased a pound of cocaine from Larry King. Before the trip, he received front money from Susy Evans ($2,000), George Rose ($950), and Kevin Ricksy ($2,800). Kevin Ricksy accompanied McGuire to Chicago to purchase the cocaine, and on the way back to Danville, he drove McGuire's car. On the return trip to Danville, McGuire and Ricksy had the misfortune of being stopped by Illinois State Trooper William Newman for missing taillights.

At about 1:00 a.m. on May 6, 1989, Newman was on routine patrol on Interstate 57 when he noticed a car in his rear-view mirror that appeared to be speeding. He pulled off into the median and, as the car passed by, saw that it had no taillights. Newman pulled back out onto the interstate, activated his emergency lights and pulled the car over. While Newman was pursuing the car, he saw the passenger, later identified as McGuire, bend forward as if he was placing something on the floorboard or under the seat. Newman thought this movement was suspicious.

After verifying that the car was not stolen, Newman went to the driver's side of the car and asked the driver for his license. The driver stated he did not have his driver's license but was "driving on a ticket."[2] The driver gave Newman the ticket, which identified him as Kevin Ricksy. When Ricksy told Newman that the car did not belong to him, the passenger of the car stated that the car was his and handed Newman an Illinois registration card. The card identified the owner as Kim McGuire.

Newman walked to the passenger side to talk to McGuire. The passenger-side window was missing and had been replaced with opaque plastic through which Newman could not see clearly. Newman and McGuire simultaneously opened the car

* Hon. John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

1. On one occasion, Ty Welsch was purchasing four ounces of cocaine from McGuire on behalf of his friend, "Mike." McGuire told Welsch that he had gotten a "really good price" on a large quantity of cocaine because he had driven to Chicago himself. McGuire said that the cocaine cost him less when he picked it up himself. McGuire decided to pass on the cost savings to Welsch stating, "Tell your boy that it's $1050 an ounce because that's normally what I sell it for

but because I got such a good deal I am going to give you an opportunity to make some money and I am going to sell it to you for $900 an ounce." Welsch did sell the cocaine to Mike for $1050 an ounce and made $600 on the deal.

2. "[W]hen a driver receives a ticket for a moving violation the policeman takes his license and until it is returned the driver 'drives on the ticket,' that is, uses the ticket as a temporary license." *United States v. Cardona–Rivera*, 904 F.2d 1149, 1153 (7th Cir.1990).

door. Newman asked McGuire why he had made the suspicious movements after Newman had signalled the car to stop. McGuire did not respond. Newman then saw a brown paper bag on the floorboard. He asked McGuire what was in the bag and if McGuire would hand it to him. McGuire gave Newman the bag. Newman looked in the bag and discovered one opened, half-empty bottle of Heffenefer malt liquor and two unopened bottles. At that point, Newman had McGuire and Ricksy step out of the car, go to the front of the car, and place their hands on the hood.

Newman then searched the front floorboard and under the seat on the passenger side for more open alcohol containers. Newman found another brown paper bag under the passenger seat, only this one contained marijuana. Newman advised McGuire and Ricksy that they were under arrest and handcuffed them. At that point, an off-duty agent of the Illinois State Police Department of Criminal Investigations (DCI) stopped and offered to help Newman. While the DCI agent watched the suspects, Newman inventoried the car for towing.

As part of the inventory, Newman removed the car keys from the ignition and opened the trunk. In his inventory of the trunk, Newman found another brown paper bag; this one contained a plastic bag with two cakes of a white compressed powdery substance inside. The substance field-tested positive for cocaine. Newman then read McGuire and Ricksy their *Miranda* warnings. Later testing revealed that one cake was 227.3 grams of 88.8% pure cocaine and the other was 229 grams of 89.3% pure cocaine.

Around 6:00 a.m., the police took McGuire to the Public Safety Building in Danville where he was interviewed for about an hour by Cary Grant, a DCI agent, and Phil Johnson, an IRS agent. The interview took place in a room approximately twelve feet by seven feet furnished with a table and three chairs. During the interview, McGuire sat in the middle of the table; Grant and Johnson sat at opposite ends of the table. The door was closed; McGuire was not handcuffed; and there were no weapons in the room.

At the beginning of the interview, Grant again advised McGuire of his *Miranda* rights and informed him that he was going to be prosecuted in federal court. McGuire told Grant he wanted to make a statement and asked Grant about possible sentences. Grant told McGuire that he could be sentenced anywhere from probation to ten years in prison. He also informed McGuire that he had no control over the sentence and could not say exactly what sentence McGuire would receive. McGuire asked Grant to guarantee probation. Grant told McGuire that he could not make such a promise but would inform the prosecuting attorney of any cooperation. Grant also told McGuire that the prosecuting attorney would inform the sentencing judge about his cooperation and that the judge would take it into consideration. McGuire then gave a statement describing his drug activities.

Based on this confession and the cocaine found in the trunk of his car, McGuire was indicted for possession of cocaine with the intent to distribute and conspiracy to possess cocaine with the intent to distribute. Prior to trial, McGuire moved to suppress the cocaine and his confession. The district court denied McGuire's motion to suppress finding that the stop and subsequent search of McGuire's car were legal and his confession was voluntary. A jury convicted McGuire, and the district court sentenced him to an eight-year prison term. McGuire appeals his conviction arguing that the district court should have suppressed the cocaine and his confession. He also contends that the district court erred in applying the Sentencing Guidelines by increasing his offense level because he was a manager in criminal activity involving five or more participants and by refusing to reduce his offense level for acceptance of responsibility.

## II. The Search

McGuire's first argument on appeal is that the district court erred in denying his motion to suppress the cocaine found in the

trunk of his car. McGuire contends that Trooper Newman's initial, warrantless search of the bag containing the open bottle of beer violated the Fourth Amendment. Because Newman's discovery of the cocaine was a product of this illegal search, McGuire argues, it should have been suppressed.

A warrantless search conducted pursuant to consent which is "freely and voluntarily given" does not violate the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Whether consent to a warrantless search was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048. *See also United States v. Durades*, 929 F.2d 1160, 1163 (7th Cir.1991). The district court found that McGuire consented to the search of the bag containing open alcohol. We will reverse the district court only if this finding is clearly erroneous. *Durades*, 929 F.2d at 1163.

Newman testified at the suppression hearing that McGuire voluntarily handed him the bag in response to his question, "What's in that bag?" Although McGuire testified that Newman ordered him out of the car and then searched for the bag, the district court stated that it believed Newman and did not believe McGuire. We will not disturb the district court's credibility determinations. *See United States v. Cardona–Rivera*, 904 F.2d 1149, 1152–53 (7th Cir.1990) (trial judge's credibility determinations in deciding a motion to suppress are conclusive unless "contrary to a law of nature"). Further, there is no evidence in the record of any intimidation or coercion by Newman. Newman simply made a routine traffic stop and casually asked McGuire about the bag. By handing the bag to Newman, McGuire voluntarily consented to the search.[3]

As the district court noted, it is all downhill from here. Under the "automobile exception" to the warrant requirement, a car may be searched without a warrant if there is probable cause to believe that the car contains contraband or evidence. *Carroll v. United States*, 267 U.S. 132, 149 & 153–56, 45 S.Ct. 280, 283 & 285–86, 69 L.Ed. 543 (1925). Probable cause exists if, given the totality of the circumstances, there is a "fair probability" that the car contains contraband or evidence. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Once Trooper Newman discovered that McGuire was transporting open, alcoholic liquor in violation of Illinois law, Ill.Rev. Stat. ch. 95½, para. 11–502, he had probable cause to believe that the car contained additional contraband or evidence. *Cf. United States v. Hatfield*, 815 F.2d 1068, 1071–72 (6th Cir.1987) (discovery of illegal police scanners and burglary tools in passenger compartment gave police probable cause to search the entire vehicle); *United States v. Sink*, 586 F.2d 1041, 1048 (5th Cir.1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979) (discovery of counterfeit bills during legal pat-down search gave police probable cause to search the entire vehicle). This probable cause gave Newman the authority to search every part of the vehicle and its contents that could conceal additional contraband, including the area beneath the passenger seat and the trunk. *United States v. Ross*, 456 U.S. 798, 822–25, 102 S.Ct. 2157, 2171–73, 72 L.Ed.2d 572 (1982).

In addition, the search of the trunk of McGuire's car was authorized under the "inventory search" exception to the warrant requirement. Newman placed McGuire and Ricksy under arrest after he discovered the bag of marijuana that was hidden under the passenger seat. Then, he inventoried the car for towing using a standard inventory form pursuant to Illinois

---

**3.** McGuire also argues that, because he had not been arrested at the time the bag containing open alcohol was searched, the search does not fall into the "search incident to arrest" exception articulated in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Although McGuire may be correct that this exception to the warrant requirement does not apply, it does not advance his case. He consented to the search. That was all Trooper Newman needed to search the bag.

State Police rules and regulations. Such warrantless inventory searches do not violate the Fourth Amendment. *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Velarde,* 903 F.2d 1163, 1166 (7th Cir.1990) (inventory search of trunk according to established Illinois State Police procedure did not violate the Fourth Amendment). Newman found the cocaine during this legitimate inventory search.

### III.  The Confession

McGuire next challenges the voluntariness, and hence the admissibility, of the post-arrest statements he made to law enforcement officials. As noted above, McGuire was interrogated by DCI Agent Cary Grant on the morning of his arrest. Agent Grant told McGuire that any cooperation on his part would be conveyed to the prosecuting attorney and the sentencing judge. Grant also stated that the judge would consider McGuire's cooperation at sentencing. McGuire contends that these promises fraudulently induced his confession.

A confession is voluntary if "it was not secured through psychological or physical intimidation but rather was the product of a rational intellect and free will." *United States v. Haddon,* 927 F.2d 942, 945 (7th Cir.1991). "The test for a voluntary confession is 'whether the defendant's will was overborne at the time he confessed.'" *Id.* at 945–46 (quoting *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963)). The district court denied McGuire's motion to suppress his confession, and we must rely on its factual findings unless they are clearly erroneous. The ultimate issue of the voluntariness of a confession, however, is a question of law subject to *de novo* review. *United States v. Carter,* 910 F.2d 1524, 1529 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).

There is absolutely no indication in the record that McGuire's will was overborne by Agent Grant's promise that he would inform the government about McGuire's cooperation. The district court found that, during the interview, McGuire appeared to be sober, in possession of his faculties and not under any sort of duress. McGuire had not been deprived of any basic necessities. Agent Grant read McGuire his *Miranda* rights, and McGuire indicated that he understood those rights. The interview only lasted for about an hour. Agent Grant did tell McGuire that his cooperation would be considered by the sentencing judge. However, Grant also stated that he had no control over McGuire's sentence. Further, when McGuire asked Grant to guarantee probation, Grant refused stating he could not make such promises. Under these conditions, McGuire's confession was not secured through psychological or physical intimidation but rather was the product of a rational intellect and free will.

### IV.  The Sentence

McGuire challenges his sentence on two grounds. First, McGuire contends that the district court erred in finding that he was a "manager" in criminal activity involving five or more participants and thus increasing his offense level by three levels pursuant to § 3B1.1 of the Sentencing Guidelines. Second, McGuire argues that the district court erred in refusing to decrease his offense level by two levels for acceptance of responsibility under § 3E1.1 of the Guidelines. We will not reverse these findings unless they are clearly erroneous. 18 U.S.C. § 3742(e); *United States v. Herrera,* 878 F.2d 997, 999–1000 (7th Cir.1989).

### A.  Enhancement for Role as Manager

Section 3B1.1 of the Sentencing Guidelines provides for adjustments to the offense level based upon the role the defendant played in committing the offense. The offense level is increased by three points "[i]f the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). McGuire does not really dispute that he played a management role in this drug conspiracy, nor can he. The evidence showed that McGuire gave money to couri-

ers who picked up cocaine from his supplier, Larry King, and delivered the cocaine to him. He then cut the cocaine into smaller amounts and resold it to other drug pushers who sold on the street. Rather, McGuire contends that this section is inapplicable because he did not manage five or more participants.

The district court found that McGuire managed seven participants in the criminal activity. A "participant" under § 3B1.1 "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1. A defendant "manages" a participant if he exercises some control over the participant. *See United States v. Brown*, 944 F.2d 1377, 1380–82 (7th Cir.1991). Although we agree with the district court that the criminal activity involved seven participants, we do not agree that McGuire managed all seven participants.

First, the district court found that McGuire managed Kevin Ricksy. This finding is not clearly erroneous. Ricksy gave McGuire money for the purchase of cocaine. Ricksy was also a drug courier for McGuire. He went to Chicago with McGuire to pick up cocaine, and he drove McGuire's car on the way back to Danville.

■ The district court also found that McGuire managed Susy Evans and George Rose. It's clear that Evans and Rose were "participants" in the criminal activity. McGuire told Agent Grant that Evans and Rose provided money for the purchase of the pound of cocaine that was seized from his car. At the sentencing hearing, McGuire recanted this statement. He testified that Evans and Rose had merely "loaned" him money and did not know that the money was being used to purchase cocaine. The district court, as it was free to do, credited McGuire's earlier statement to Agent Grant. It is not clear, however, that McGuire "managed" Evans and Rose. Evans and Rose gave McGuire money to purchase amounts of cocaine too large for personal consumption, and the district court reasonably inferred that they were

reselling the cocaine on the street. But, there is no evidence that McGuire controlled any aspect of the purchases or the redistribution of the cocaine. Evans and Rose were McGuire's customers, and probably his co-conspirators, but were not his employees or his subordinates. As to these two, McGuire was only a middleman, and middleman status alone cannot support a finding that McGuire managed Evans and Rose. *Brown*, 944 F.2d at 1382.

Finally, the district court found that McGuire managed four drug couriers—Ivory Omus, Leopold Davis, Herman Foreman and "Snoot." These four people delivered cocaine to McGuire and are "participants" in the criminal activity. Further, McGuire managed Omus and Davis. He sent Omus and Davis to Chicago to pick up his cocaine from Larry King. Foreman and Snoot, however, were dispatched by Larry King. On King's orders, they would drive from Chicago to Danville and deliver cocaine to McGuire. McGuire, therefore, did not control Foreman and Snoot.

Thus, although there were seven participants in the criminal activity, the evidence only shows that McGuire controlled three of them: Ricksy, Omus and Davis. Nonetheless, the district court's increase in offense level was proper because § 3B1.1(b) does not require actual control over the "five or more participants." The plain language of § 3B1.1(b) requires only that a defendant was a manager "*and* the criminal activity involved five or more participants"—not that a defendant managed, or controlled, the five or more participants. A defendant is a "manager" if he " 'exercised *some* control over others involved in the commission of the offense.' " *Brown*, 944 F.2d at 1381 (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir.1990)) (emphasis added). "Thus, section 3B1.1 does not apply to a defendant who merely organizes or supervises criminal activity that is executed without the aid of others." *Fuller*, 897 F.2d at 1220. However, there is no requirement in § 3B1.1(b) that a defendant control the activities of all the par-

ticipants in the criminal activity.[4]

McGuire controlled the activities of at least three people in the criminal activity, and was, therefore, a "manager" within the meaning of § 3B1.1(b). Further, the criminal activity involved seven participants. Thus, the requirements of § 3B1.1(b) are met in this case by the showing that McGuire was a "manager" and the criminal activity involved "five or more participants." The district court correctly increased McGuire's offense level by three.

We must also affirm the district court's three-level increase pursuant to § 3B1.1(b) because the criminal activity was extensive. Section 3B1.1(b) applies if the criminal activity involved five or more participants *or* "was otherwise extensive." The district court found that the criminal activity was extensive, and McGuire does not challenge this finding. This is an independent basis for the § 3B1.1(b) three-level increase. *See United States v. Reid*, 911 F.2d 1456, 1465–66 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991).

### B. Acceptance of Responsibility

 Section 3E1.1(a) of the Sentencing Guidelines provides for a two-level reduction in offense level "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." "The question of whether a defendant has accepted responsibility for his crimes is a factual one, depending largely on credibility assessments of the sentencing judge." *United States v. McKenzie*, 922 F.2d 1323, 1329 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). Thus, the district court's decision on this point is entitled to great deference and will not be disturbed unless it is without foundation. *Id.;* U.S.S.G. § 3E1.1, Application Note 5.

 Although McGuire did cooperate with the Illinois State Police to some extent, the district court refused to reduce McGuire's offense level for acceptance of responsibility because the defendant "waffled" in his dealings with the police. The district court found that McGuire would cooperate and then dissemble; he made statements about his drug activities and then he recanted those statements. Thus, the district court concluded that McGuire did not "clearly demonstrate[ ] a recognition and affirmative acceptance of personal responsibility for his criminal conduct." We cannot say that the district court's decision was clearly erroneous.

### V. Conclusion

For the foregoing reasons, McGuire's conviction and sentence are

AFFIRMED.

---

**4.** *United States v. Reid*, 911 F.2d 1456, 1464–65 & n. 8 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991) is not to the contrary. The court in *Reid* stated only that a defendant receiving a "leader or organizer" enhancement under § 3B1.1(a) must have some control, direct or indirect, over the five participants. This makes sense: to lead an organization you must control its members. But to be a manager in an organization "(but not an organizer or leader)," § 3B1.1(b), you need not control all of its members.