**UNITED STATES of America**

**v.**

**Will ADAMES, Defendant.**

**No. S1 94 Cr. 709 (DC).**

United States District Court,
S.D. New York.

May 9, 1995.

Mary Jo White, U.S. Atty. S.D.N.Y. by Daniel C. Becker, Asst. U.S. Atty., New York City, for U.S.

Barry Berke, The Legal Aid Society, Federal Defender Services Unit, S.D.N.Y., New York City, for defendant.

### OPINION

CHIN, District Judge.

On August 31, 1994, defendant Will Adames was arrested by agents of the Drug Enforcement Administration ("DEA"). The next day, he was charged in a complaint with narcotics violations. On October 14, 1994, he was indicted, along with Rafael Perez Luna, for conspiring to distribute and possessing with intent to distribute more than 100 grams of heroin. Adames now moves to suppress physical evidence seized from and statements made by him on the day of his arrest. An evidentiary hearing was held on Adames's motion on April 4, 1995, and argument was heard on April 25, 1995.[1]

The motion is granted. My findings of fact and conclusions of law follow.

### The Facts

At approximately 5:45 p.m. on August 31, 1994, as part of an ongoing investigation, Special Agents Anthony P. Farretta, Jr. and Armande Kaladi of the DEA were on surveillance in the vicinity of Colden Avenue in the Bronx. (H.Tr. 3–4, 44–50, 61–62). They observed Adames entering the building at 1642 Colden Avenue. Although he was not carrying anything when he entered the building, he was holding a brown paper bag when he left 15 minutes later. (H.Tr. 4, 62). He then got into an automobile and drove, by an indirect or "circuitous" route, to the corner of Powell and Olmstead in the Bronx. Farretta, Kaladi and two other DEA agents followed him in four separate vehicles. (H.Tr. 4–5, 62–63).

At the corner of Powell and Olmstead, Adames got out of the car, carrying the brown bag. He opened the trunk of the car, reached into the brown bag, and pulled out a grey, rectangular box. He dumped the remaining contents of the bag into the trunk, and placed the box back into the bag. (H.Tr. 6–7, 29; DX 1). Farretta had previously seen hundreds of similar boxes, in connection with the production or distribution of heroin; the boxes are used to hold glassine envelopes of the type used in the sale of heroin. (H.Tr. 6–7). Farretta had also previously seen Adames while on surveillance as part of an ongoing investigation of illegal drug activity. (H.Tr. 44–49).

Adames then closed the trunk of the car, turned away, walked across the street, and entered a "bodega." (H.Tr. 8, 29, 64). Both Farretta and Kaladi followed him into the bodega. (H.Tr. 64–65, 104–05; *see also* H.Tr. 29). While buying a bottle of water,

---

1. References to "H.Tr." and "A.Tr." are to the transcripts of the hearing and argument, respectively.

Adames saw both Farretta and Kaladi; one was standing behind him and the other was at the door. Adames walked out, passing them. (H.Tr. 30, 104–05). Both Farretta and Kaladi followed Adames out of the bodega and followed him a few yards down the street. (H.Tr. 30, 65).

Farretta and Kaladi then stopped Adames by identifying themselves as police officers. (H. Tr. 31, 32, 65; *see also* GX 3501–B, at ¶ 4 ("the other DEA agent and I *stopped* the defendant") (emphasis added)). Kaladi showed his badge to Adames. (H.Tr. 8–9, 65). Adames had his back to a wall, and he was flanked by Farretta on one side and Kaladi on the other. (H.Tr. 31). They were "relatively close" to him, each about an arm's length away. (H.Tr. 32). The time was shortly after 6 p.m.; the lighting was good; and, with the exception of a gentleman on the corner, there were no other people on the street, which was a public street. (H.Tr. 11).

At that point, Farretta said to Adames, in words or substance, "let me see what you have inside the bag." (H.Tr. 105, 106, 118).[2] Adames, who was holding the bag in one hand, with the top of the bag folded down to give him a handle to hold onto, gave Farretta the bag. (H.Tr. 106–07). He gave the bag

to the agents because they were police officers and they had told him to give it to them. (H.Tr. 107). Without explicitly asking Adames for consent to search or open the bag, Farretta took the bag and opened it. (H.Tr. 108).[3] Without explicitly asking for consent to search or open the grey box that was inside the bag, Farretta then reached in and took the lid off the box. He saw empty glassine envelopes inside. (H.Tr. 9, 108; *see* H.Tr. 41–42).

The agents asked Adames where he was taking the box, and Adames responded by telling him Apartment 4D in a building subsequently identified as 2070 Powell Avenue. (H.Tr. 12, 66–67). The agents asked Adames several more questions: who was in the apartment; who was with the person who was in the apartment; and were there any weapons in the apartment. (H.Tr. 12). The two agents then instructed Adames to walk with them across the street to his car. (H.Tr. 12, 67, 109).

When they arrived at the car, the agents searched it. (H.Tr. 13).[4] Adames opened the trunk of the car, and eventually he gave the car keys to the agents, who did not return them. (H.Tr. 109–10).[5] After the car was searched, the agents asked Adames

---

**2.** The agents, both of whom testified at the hearing, contradicted themselves as to what happened immediately after Adames was stopped. Farretta testified that, after approaching Adames, he asked Adames what was in the bag. (H.Tr. 9). On the other hand, Kaladi testified (in response to a leading question) that, immediately after the agents identified themselves as police officers, he asked Adames where he came from. (H.Tr. 66, 93). Moreover, as discussed further in footnote 4 below, Kaladi gave inconsistent statements as to who opened the bag. In view of the discrepancies, and since it is the Government's burden to prove consent (*see* discussion below), I will accept Adames's testimony that Farretta said "let me see what you have inside the bag."

**3.** Farretta testified that Adames opened the bag. (H. Tr. 9). Kaladi, however, testified that he could not recall who opened the bag. (H. Tr. 94). Although he was present when the bag was opened and "could see everything that was happening," he testified that he did not have firsthand knowledge of who opened the bag. (H.Tr. 92, 96). Yet, when Kaladi made an oral application for a search warrant just a few hours after the arrest, he testified that "[t]he other agent opened the brown paper bag." (H.Tr. 83–84;

GX 3501–A, at 5). Likewise, in the complaint, which was sworn to September 1, 1994, Kaladi stated that "[t]he other agent opened the bag." (H.Tr. 83; GX 3501–B, at ¶ 4). In contrast, Kaladi testified in the grand jury on October 14, 1995 that after Farretta asked Adames what was in the bag, *Adames* took the box out of the bag and gave the box to Farretta. (H.Tr. 96; GX 3501–E, at 7). At some point prior to his grand jury testimony, Kaladi had discussions with the United States Attorney's Office during which he was told that the Office was considering dismissing all charges against Adames. (H.Tr. 86). Although he could not "recall exactly" if one of these reasons was a concern about the legality of Adames's consent, Kaladi did recall being questioned by the prosecutors about the "initial stop and encounter" with Adames. (H.Tr. 86–88).

**4.** The DEA–6 (GX 3501–C) states that Adames "gave verbal consent" to the search of his car, but it is silent as to whether consent was given to search the bag. (*See* H.Tr. 78–79).

**5.** Farretta did not recall who had the car keys. (H.Tr. 5–6, 55). Kaladi testified that he obtained the keys at some point and that the keys were "vouchered" later on that evening. (H.Tr. 68).

whether the windows to the apartment looked out onto the street; he responded that the windows were at the back of the building looking into the alley. (H.Tr. 13, 67–68). In response to questions from the agents, Adames also stated that he had been delivering these boxes for about a month and that he was being paid $60 for doing it. (H.Tr. 13–14, 67–68).[6]

At some point, Mr. Adames was brought into the building at 2070 Powell Avenue, where he was handcuffed. (H.Tr. 17, 70–71). Eventually, Apartment 4D was searched pursuant to a search warrant and heroin and drug paraphernalia were recovered. (H.Tr. 21–22).

It is undisputed that Adames was not read his *Miranda* rights until later that evening, well after he was handcuffed. (H.Tr. 58; Adames Aff. ¶ 7).

On August 31, 1994, Adames was 20 years old. He was born in a small town in the Dominican Republic and came to the United States in March 1986. He has lived with his parents since shortly after he arrived in the United States. His last grade of schooling was the eighth grade. He has worked as a car washer and as a "helper" in the repair of automobile transmissions. Spanish is his first language, although he is able to speak some English. (H.Tr. 100–04).

### DISCUSSION

Adames's motion presents the following issues: (1) whether the agents' initial "stop" of Adames was "consensual"; (2) whether the agents had a "reasonable articulable suspicion" of criminal activity sufficient to justify stopping Adames; (3) whether Adames voluntarily consented to the search of the paper bag; and (4) whether Adames was in "custody" when the agents questioned him after the search of the car.

### 1. The "Stop"

The Fourth Amendment prohibits a warrantless "seizure" of a person unless there is a "reasonable articulable suspicion" of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). Not every police stop is a seizure. As the Supreme Court has held,

[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' ... the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

*Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). The key is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick,* 501 U.S. at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

The Government argues in the present case that "the stop was entirely a consensual stop" because the agents merely approached Adames and asked him to talk with them. (A.Tr. at 3). The Government notes that the encounter occurred on a public street during daylight hours and the agents did not display weapons or indicate to Adames that he was not free to leave. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions

---

6. In its memorandum of law in opposition to Adames's motion submitted prior to the evidentiary hearing, the Government took the position that these questions were asked and answered *prior* to the search of Adames's vehicle. (Gov't Mem. at 3). Kaladi testified at the hearing, however, that these questions were asked *after* he searched the car. (H.Tr. at 67–68). Adames's testimony regarding the sequence of events after the search of the bag was unclear. (*See* H.Tr. at 109–10, 124–33).

to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions") (citations omitted); *United States v. Masse*, 816 F.2d 805, 809–10 (1st Cir.1987) (Fourth Amendment not implicated where pre-arrest questioning was brief and took place in the afternoon on a public street); *see also United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir.1991) (there "is no requirement that an officer affirmatively advise an interviewee that he is free to leave or terminate the interview").

I find, however, that the stop here was not consensual. Taking into account all the circumstances surrounding the encounter, I find that the agents' conduct communicated to Adames—and would have communicated to any reasonable person—that he was not at liberty to ignore their presence and go about his business.

Adames was not simply approached on the street. Rather, he was followed by both agents into the bodega. They stood watching as he bought a bottle of water, and Adames could see that they were there watching him. They continued to watch him as he walked past them out of the bodega. They then followed him down the street and stopped him, identifying themselves as police officers and displaying a badge. They flanked him while he had his back to the wall, a mere arms-length away, thereby impeding his path and interfering with his ability to walk away. They did not then ask him if he was willing to answer questions; rather, they instructed him to show them what was in the bag. Clearly, under these circumstances, Adames could not have simply ignored the agents and gone about his business. Hence, the stop constituted a "seizure" within the meaning of the Fourth Amendment.

### 2. *Reasonable Suspicion of Criminal Activity*

█ The second issue is whether the agents had a "reasonable articulable suspicion" of criminal activity sufficient to justify detaining Adames without a warrant. *Terry v. Ohio*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80. I find that they did.

The agents were involved in an ongoing investigation of illegal drug activities. Adames had previously been seen meeting with a subject of that investigation. He went into the building at Colden Avenue empty-handed and left a few minutes later carrying a bag. He took a circuitous route from Colden Avenue to Powell Avenue. He was seen handling a grey box of the type often used to hold glassine envelopes used for the illegal distribution of heroin. Under these circumstances, I find that the agents had a reasonable, articulable basis for suspecting Adames of engaging in criminal activity, and thus they were justified in stopping him.

### 3. *The Search of the Bag*

█ The more difficult issue is whether Adames voluntarily consented to the search of the paper bag. It is the Government's burden to prove by a preponderance of the evidence that consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222–23, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *see United States v. Matlock*, 415 U.S. 164, 177–78 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). To determine voluntariness, a court must examine the totality of the circumstances, and no one factor is controlling. *Schneckloth*, 412 U.S. at 238, 93 S.Ct. at 2053; *see United States v. Hernandez*, 5 F.3d 628, 632–33 (2d Cir.1993). As the Court wrote in *Schneckloth*,

> Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

412 U.S. at 226, 93 S.Ct. at 2047 (citations omitted). The Government need not show, to prove consent, that the subject knew that he had a right to decline the request for a search. 412 U.S. at 234, 93 S.Ct. at 2051.

█ Here, the Government has not persuaded me that, under all the circumstances, Adames voluntarily consented to the search of the bag. First, the Government's proof simply was not persuasive. The agents con-

tradicted each other in material ways; their hearing testimony was at odds with the recitation of facts set forth in the Government's pre-hearing memorandum; and one of the agents testified in three substantially different respects on a critical factual issue: first he swore that the other agent opened the bag; later he swore that Adames opened the bag; and finally, at the suppression hearing, he swore that he could not recall who opened the bag because he did not have "firsthand knowledge."

Second, the encounter did not involve a casual inquiry by the agents. To the contrary, the agents followed Adames into the bodega; stood there openly watching him as he made a purchase; followed him out of the bodega; followed him down the street; stopped him by identifying themselves as police officers; flanked him as he stood with his back to the wall; impeded his ability to walk away; and then instructed him to show them what was in the bag.

Third, as I have found, Adames was not *asked* what was in the bag. The agents did not ask for his "consent" or "permission," nor did they even ask him, as they did with respect to the automobile, if they could "look" in the bag. (*See* H. Tr. 67). Nor they did advise him of his right to refuse to speak. *See Campaneria v. Reid*, 891 F.2d 1014, 1019–20 (2d Cir.1989), *cert. denied*, 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991) (failure to give *Miranda* warnings a relevant factor in overall determination of voluntariness). Rather, they *instructed* him to show them what was in the bag.

Finally, at the time of the encounter Adames was only 20 years old; he had no more than an eighth grade education; and had been in the United States for only some eight years. Under all the circumstances, I do not believe that Adames acted voluntarily when he gave the bag to Farretta.

The Government argues that Adames did voluntarily consent because, by his own testimony, he held the bag up in a "gesture" that any reasonable person would have assumed was consent to a search of the bag. (A.Tr. at 7). In support of its position, the Government relies on *United States v. McGuire*, 957 F.2d 310 (7th Cir.1992), which involved a warrantless search of a bag. There, a police officer made a "routine traffic stop" of the defendant and saw a paper bag on the floor of the vehicle. The officer "casually" asked the defendant "[w]hat's in the bag?" The defendant responded by handing the bag to the officer. The district court held that, under these circumstances, the defendant voluntarily consented to the search by handing the officer the bag. The Seventh Circuit affirmed. 957 F.2d at 314.

While the *McGuire* case is similar in some respects to the present case, it is also distinguishable in certain material respects. First, there, the defendant was "casually" asked what was in the bag; here, Adames was instructed to show the agents what was in the bag. Second, in *McGuire*, the encounter was the result of a "routine traffic stop"; here, Adames was followed into and out of the bodega and flanked by two agents with his back to a wall when he was told to show them what was in the bag. Third, the defendant in *McGuire* apparently was a fairly sophisticated individual,[7] while Adames is a somewhat uneducated 21-year old who was only 20 on the date of his arrest.

Accordingly, I find that the Government has not met its burden of proving that Adames voluntarily consented to the search of the bag. The contents of the bag are suppressed, as are the statements that immediately followed the search of the bag: (i) where Adames was going, (ii) who was in the apartment, and (iii) whether there were any weapons there.[8]

---

7. When the defendant in *McGuire* was sentenced, the offense level was increased under the Sentencing Guidelines because he was "a manager in criminal activity involving five or more participants." 957 F.2d at 313.

8. At minimum, these statements that immediately followed the search must be suppressed as fruits of the illegal search, for the statements

were made by Adames directly as a result of what the agents found in the bag—the box; indeed, the agents asked Adames "where he was delivering the box to." (H.Tr. 66). *See Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); *see also United States v. Knoll*, 16 F.3d 1313, 1321 (2d Cir.1994).

### 4. *The Issue of Custody*

 The Government contends that even if consent to search the bag was not voluntarily given, the statements made by Adames after the search of the car should not be suppressed because Adames was not in "custody" when he made them and a reasonable person in the circumstances still would have felt free to leave. (A.Tr. 13, 17). Adames argues, on the other hand, that he was in custody and that the agents' questioning of him without advising him of his *Miranda* rights violated the Fifth Amendment. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317 (1984) ("if the police take a suspect into custody and then ask him questions without informing him of [his *Miranda* ] rights ..., his responses cannot be introduced into evidence to establish his guilt.").

A defendant is in "custody" if, objectively speaking, "a reasonable person in the defendant's position would have understood himself to be 'subjected to restraints comparable to those associated with a formal arrest.'" *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992) (quoting *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151). In the absence of an actual arrest, "an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *Mitchell*, 966 F.2d at 98; *see also Campaneria*, 891 F.2d at 1020–21 n. 1 ("An accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.") (citation omitted).

Here, I find that the agents did convey to Adames the message that he was not free to leave. I do not believe that a reasonable person in his circumstances would have felt free to go about his business. As noted above, Adames had not been detained for mere casual inquiry. Rather, he was followed by the agents and then detained, with his back to the wall and the agents impeding his ability to walk away. He was instructed to show the agents what was in the bag, and they found empty glassine envelopes. They then instructed them to walk with them to his car. They then searched his car, and in the course of doing so, they took possession of his car keys, which they did not give back to him. Without his car keys, Adames could not leave with his car, and by keeping his keys, the agents conveyed to Adames the message that he could not leave at all.[9] *See United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990) ("prolonged retention of a person's personal effects" is a factor suggesting a "seizure" of a "person" for Fourth Amendment purposes).[10]

Hence, I find that Adames was in custody when he was interrogated after the search of the car. Accordingly, since Adames was not given *Miranda* warnings until well after the interrogation, the following statements may not be introduced into evidence to establish his guilt: (i) where the windows of Apartment 4D were located, (ii) how long he had been delivering the boxes, and (iii) how much he was being paid.

### CONCLUSION

Adames's motion to suppress is granted. SO ORDERED.

---

9. Indeed, although he could not recall the specifics of what happened with the keys, Kaladi essentially conceded that he kept the keys to prevent Adames from leaving; he testified that it "would stand to reason" that he would have wanted to retain the keys to make sure that Adames did not leave. (H.Tr. 91).

10. The Government relies on *Lee* and *United States v. Montilla*, 928 F.2d 583, 588–89 (2d Cir.1991), in which the Second Circuit found stops to be consensual even though identification documents were retained by police officers. The Government argues that car keys are similar to identification documents in the sense that the owner of car keys will be just as reluctant to walk away as owners of identification documents that have been retained. (A. Tr. 16). The reliance on the two cases is misplaced. In *Montilla*, the agents retained the defendant's identification documents only after they discovered he was carrying identification in two different names. 928 F.2d at 589. In *Lee*, after examining the defendant's driver's license and airplane tickets, the officers "promptly returned them to him." 916 F.2d at 819.